**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MARIA BATAN and CLEMENTE BATAN, Derivatively on Behalf of HEALTHCARE SERVICES, GROUP, INC., | Case No. _____ |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| THEODORE WAHL, MICHAEL E. McBRYAN, DANIEL P. McCARTNEY, JOHN C. SHEA, and MATTHEW J. McKEE, | |
| Defendants, | |
| -and- | |
| HEALTHCARE SERVICES GROUP, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

# TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ........................................................................ 1

II.     JURISDICTION AND VENUE .................................................................... 4

III.    PARTIES ........................................................................................................ 5

    A.   Plaintiffs ................................................................................................. 5

    B.   Nominal Defendant ................................................................................ 5

    C.   Director Defendants ............................................................................... 6

    D.   Non-Defendant Directors ...................................................................... 6

    E.   Executive Defendants ............................................................................ 7

IV.     BACKGROUND ........................................................................................... 7

    A.   HCSG's Business .................................................................................... 7

    B.   HCSG's Operational Management and Reporting Systems ................. 11

    C.   Significance of EPS and Quarterly Consensus Estimates .................... 12

V.      INTERNAL COMPANY OPERATIONS ALLEGED IN THE SECURITIES ACTION
        PER CONFIDENTIAL WITNESSES ......................................................... 14

VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 24

VII.    THE TRUTH EMERGES ........................................................................... 69

VIII.   THE SEC'S INVESTIGATION AND THE SECURITIES ACTION REPRESENT
        SIGNIFICANT LOSSES FOR THE COMPANY ...................................... 72

IX.     DERIVATIVE AND DEMAND REFUSED ALLEGATIONS ................... 74

X.      CLAIMS FOR RELIEF ............................................................................. 78

    COUNT 1 (Derivatively Against the Individual Defendants for Breach of Fiduciary Duties) 78

    COUNT II (Derivatively Against the Individual Defendants for Unjust Enrichment) ............ 80

    COUNT III (Derivatively Against the Individual Defendants for Abuse of Control) ............. 80

    COUNT IV (Derivatively Against the Individual Defendants
        for Waste of Corporate Assets) ............................................................ 81

XI.     PRAYER FOR RELIEF ............................................................................ 81

XII.    JURY DEMAND ....................................................................................... 82

Plaintiffs Maria Batan and Clemente Batan ("Plaintiffs"), by their attorneys, respectfully submit this Verified Shareholder Derivative Complaint for the benefit of Nominal Defendant Healthcare Services Group, Inc. ("HCSG" or the "Company"), against certain members of its Board of Directors (the "Board") and executive officers (collectively, the "Individual Defendants"), seeking to remedy the Individual Defendants' breaches of fiduciary duties and false and misleading statements made in violation of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs make these allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which includes the review and analysis of: (a) public filings made by HCSG with the United States Securities and Exchange Commission ("SEC"); (b) press releases and other publications disseminated by HCSG and other non-parties; (c) press releases, public letters, and other publicly disseminated information regarding investigations into the Company by the SEC; (d) the proceedings of a related pending securities fraud class action filed against the Company in this District, captioned *Koch v. Healthcare Services Group, Inc.*, No. 2:19-cv-01227 (the "Securities Action"); and (e) other publicly available information concerning HCSG and the Individual Defendants.

## I.      SUMMARY OF THE ACTION

1.      This is a shareholder derivative action on behalf of Nominal Defendant HCSG, brought pursuant to 231 Pa. Code §1506.

2.      HCSG provides outsourced housekeeping and dining services to long-term and post-acute healthcare facilities in the United States. The Company's customers include over 3,000 facilities, such as nursing homes, assisted living facilities, skilled nursing facilities, rehabilitation centers, and psychiatric hospitals.

3. Theodore Wahl ("Wahl") and John C. Shea ("Shea") engaged in a long-term scheme to make it appear that the Company met or exceeded analysts' consensus estimates for the Company's earnings per share ("EPS"), a key financial metric relied upon by shareholders as an indicator of a company's profitability.

4. In March 2017, investment analyst Monocle Accounting Research ("Monocle") issued a report (the "Monocle Report") revealing that the Company had manipulated its reported EPS in the last 44 consecutive quarters.

5. According to the Monocle Report, HCSG had improperly rounded up EPS results during each of these quarters. The Monocle Report further noted that, statistically, if the odds of rounding up EPS are the same as rounding down EPS, HCSG's financial results would be equivalent to a coin-flip coming up heads 44 times in a row, the odds of which amount to a staggering 1 in 17.6 trillion.

6. In November 2017, the SEC initiated an early-stage investigation, termed a "Matter Under Inquiry" ("MUI"), into HCSG's manipulation of EPS.

7. In March 2018, the SEC opened a formal investigation into the Company's EPS reporting practices, starting a "Formal Order of Investigation," and issuing a subpoena to the Company.

8. However, the Individual Defendants continued to conceal their EPS scheme, including the SEC's investigation, from shareholders. The Company continues to publicly assert that there was no pending investigation into the Company or its practices, including in filings made with the SEC through at least December 31, 2018. The Individual Defendants further concealed that in the fourth quarter of 2018, the Company had authorized its outside counsel to conduct an

internal investigation into the matters related to the SEC subpoena, under the direction of the Company's Audit Committee.

9.     Finally, on March 4, 2019, HCSG revealed that the SEC had been investigating the Company's EPS calculations and practices for approximately 16 months.  The Company further disclosed that, during the fourth quarter of 2018, it had retained and authorized outside counsel to conduct an internal investigation under the direction of the Company's Audit Committee into matters related to the SEC's March 2018 subpoena.  HCSG announced that it would delay the filing of its annual report on Form 10-K due to the ongoing investigation.

10.     The Company has since acknowledged that the SEC investigation, which had already cost the Company millions in legal expenses and additional fees to an auditing firm for forensic services, "could result in sanctions or penalties" and "could adversely affect or cause variability in our financial results."

11.     On March 22, 2019, the Securities Action was filed against the Company, representing an unknown amount of additional costs and expenses.  The Company has taken an overall reserve accrual of over $30 million, and has not disclosed the portion of the accrual for which it has reserved for damages relating to the Securities Action.

12.     On October 11, 2019, Plaintiffs sent a demand letter to the Board demanding that the Company take action to redress the foregoing wrongdoing (the "Demand Letter").  In the Demand Letter, Plaintiffs demanded that the Board, *inter alia*, appoint a Special Committee to investigate the foregoing EPS scheme; reform the Company's claw-back policies and insider trading policies; create an independent subcommittee of the Board entrusted with overseeing certain corporate governance reforms demanded by Plaintiffs; and either replace one current Board

member with an independent member of the Board or add two new Board members to the Company's existing Board.

13.     The Company's Board has not, to date, responded to the Demand Letter.   To Plaintiffs' knowledge and belief, the Board has neither appointed a special litigation committee to consider litigation against the Individual Defendants, nor commenced an action against the Individual Defendants for the claims identified in the Demand Letter.  Plaintiffs submit that, under 15 PA Const. Stat. §1781(a)(1), Plaintiffs therefore have the right to maintain this action to enforce the rights of the Company.

14.     On April 24, 2020, the Court denied a motion to dismiss filed by the defendants in the Securities Action.  The Individual Defendants' wrongful conduct has already caused the Company to incur millions of dollars in costs related to the SEC's investigation of its EPS recording practices, the Company's own internal investigation, as well as costs incurred in defending and/or in potential settlement of the Securities Action.  In addition, the Individual Defendants' breaches of their fiduciary duties have caused reputational harm to the Company and has exposed HCSG to potential sanctions and penalties by the SEC, as well as unknown potential additional damages, as a result of the Securities Action.

## II.     JURISDICTION AND VENUE

15.     This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332.  Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum of $75,000, inclusive of interest and costs.

16.     This Court has jurisdiction over each defendant named herein because each defendant is either an individual or corporation that has sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of

fair play and substantial justice.  In addition, Nominal Defendant HCSG is incorporated in, maintains its principal executive offices in, and conducts business within, this District, through which the Individual Defendants had continuous and systemic contacts within this District.

17.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because (i) HCSG is incorporated in this State; (ii) HCSG maintains it principal place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) the Individual Defendants have engaged in numerous activities that have had an effect in this District.

## III.     PARTIES

### A.     Plaintiffs

18.     Plaintiffs Maria Batan and Clemente Batan are HCSG shareholders and have continuously held HCSG stock since at least July 2007.  Plaintiffs will fairly and adequately represent HCSG's interests in this action.

### B.     Nominal Defendant

19.     Nominal Defendant Healthcare Services Group, Inc., is a Pennsylvania corporation headquartered at 3220 Tillman Drive, Suite 300, Bensalem, PA 19020.  HCSG provides management, administrative, and operating expertise and services to the housekeeping, laundry, linen, facility maintenance, and dietary service departments of healthcare facilities.  HCSG services nursing homes, retirement complexes, rehabilitation centers, and hospitals throughout the United States and is the largest provider of housekeeping and laundry management services to the long-term care industry in the United States.

### C. Director Defendants

20.     Defendant Theodore Wahl ("Wahl") is a current HCSG director and has been since 2011.   Wahl is Defendant Daniel P. McCartney's ("McCartney") son-in-law, and succeeded McCartney to become HCSG's President and CEO in May 2015.  Wahl has also served as HCSG's President and Chief Operating Officer ("COO") from April 2012 through April 2015.  Prior to these positions, Wahl also served in various other senior executive positions at HCSG, including Executive Vice President, Vice President of Finance, and various senior management positions. As HCSG's public filings state, Wahl has "financial expertise," including expertise gained during his time as a senior manager with the Transaction Advisory Group at Ernst & Young LLP.

21.     Defendant Michael E. McBryan ("McBryan") is a current HCSG director and has been since 2011.

### D. Non-Defendant Directors

22.     Robert L. Frome ("Frome") is a current HCSG director and has been since 1983.

23.     John M. Briggs ("Briggs") is a current HCSG director and has been since 1993.

24.     Dino D. Ottaviano ("Ottaviano") is a current HCSG director and has been since 2007.

25.     Diane S. Casey ("Casey") is a current HCSG director and has been since 2011.

26.     John J. McFadden ("McFadden") is a current HCSG director and has been since 2012.

27.     Jude Visconto ("Visconto") is a current HCSG director and has been since 2015.

28.     Daniela Castagnino ("Castagnino") is a current HCSG director and has been since 2018.

29.     Laura Grant ("Grant") is a current HCSG director and has been since 2020.

### E.    Executive Defendants

30.    Defendant Daniel P. McCartney founded HCSG in 1976 and served as the Company's Chairman of the Board from 1977 until May 31, 2017.  McCartney also served as the Chief Executive Officer ("CEO") of HCSG until May 2015, when he was succeeded by his son-in-law, Defendant Wahl.  Despite McCartney's official retirement from both HCSG executive and Board positions as of May 31, 2017, McCartney continues to have an unofficial leadership role at the Company in his capacity as "Chairman Emeritus" of HCSG.

31.    Defendant John C. Shea, MBA, CPA, has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since April 2012.  Shea joined the Company in 2009 as the Director of Regulatory Reporting.  Before becoming HCSG's CFO, Shea also served as the Company's Chief Accounting Officer, Vice President of Finance, and Secretary.  Shea has a long history of sophisticated financial expertise, having previously worked as a senior manager in the Transaction Advisory Group at Ernst & Young LLP.  Shea is also a personal friend of the McCartney family.

32.    Defendant Matthew J. McKee, MBA ("McKee") joined HCSG in 2004 and serves as the Company's Chief Communication Officer.  Defendant McKee is the son-in-law of Defendant McCartney and brother-in-law of Defendant Wahl.

## IV.    BACKGROUND

### A.    HCSG's Business

33.    HCSG was incorporated in 1976.  HCSG provides management, administrative, and operating expertise and services to the housekeeping, laundry, linen, facility maintenance, and dietary service departments of healthcare facilities, including nursing homes, retirement complexes, rehabilitation centers, and hospitals located throughout the United States.  HCSG

purports to be the largest provider of housekeeping and laundry management services in the long-term care industry in the United States, providing service to over 3,000 facilities throughout the continental United States.

34.   HCSG manages its operations under two segments: Housekeeping (consisting of housekeeping, laundry, linen, and other services) and Dietary (consisting of dietary department services).  The Company's two segments serve the same customer base and share many operational similarities, but are managed separately due to the fact that the services are rendered under discrete contracts and require different types of expertise and professional management personnel.

35.   The Housekeeping segment includes the management of customers' housekeeping departments, which duties include the cleaning, disinfecting, and sanitizing of resident rooms and common areas of facilities, as well as the laundering and processing of bed linens, uniforms, residents' personal clothing, and other assorted linen items utilized at HCSG customers' facilities. HCSG typically trains on-site managers to supervise and train personnel and coordinate housekeeping services with other facility support functions.  HCSG management personnel also oversee the execution of various cost and quality control procedures, including continuous training and employee evaluation, and on-site testing for infection control.

36.   The Dietary segment includes managing customers' dietary departments, which are principally responsible for food purchasing, meal preparation, and professional dietitian services, which include the development of menus that meet the dietary needs of residents.  HCSG provides regular support through a District Manager, with on-site management responsible for all daily dietary department activities.  The Company also offers clinical consulting services to its dietary customers, which may be provided as a stand-alone service, or bundled with other dietary department services.  Upon beginning services, HCSG is also typically responsible for hiring and

training employees previously employed by a customer facility and assigning on-site managers to supervise and coordinate dietary and other support functions.  HCSG management personnel also oversee the execution of various cost and quality-control procedures including continuous training and employee evaluation.

37.     The Dietary segment currently serves approximately 1,500 dining facilities, compared to more than 3,500 facilities served for Housekeeping.  Housekeeping accounted for a majority of the Company's revenues in prior years, including as high as 66% of revenue according to the Company's Fiscal Year 2013 Form 10-K filed with the SEC on February 21, 2014.  However, Dietary has accounted for more revenue for the Company in recent years, with Dietary currently making up about half of total revenues according to the Company's Fiscal Year 2020 Form 10-K filed with the SEC on February 25, 2021.

38.     HCSG's purported growth and profit strategy focused on obtaining service agreements with new clients, providing new services to existing clients, obtaining modest price increases on client service agreements, and maintaining internal cost-reduction strategies.  In addition, it was important for the Company to provide a sufficient quality of services to its customers so that current customers would both renew contracts with HCSG and refrain from terminating them.  HCSG's contracts typically have one-year terms and contain liberal cancellation terms, allowing either party to terminate the agreement with 30 to 90 days' notice, after an initial 60- to 120-day service agreement period.

39.     HCSG has disclosed the following with respect to potential revenue growth and maintaining its customer base:

> **The primary economic factor in acquiring new customers is our ability to demonstrate the cost-effectiveness of our services, because many of our customers' revenues are generally highly reliant on Medicare and Medicaid reimbursements**.  Therefore, our customers' economic decision-making is driven

significantly by their reimbursement funding rate structure and the financial impact on their reimbursement as a result of engaging us for the respective services. The primary operational factor is our ability to demonstrate to potential customers the benefits of being relieved of the administrative and operational challenges related to the day-to-day management of their housekeeping and dietary operations. In addition, we must be able to assure new customers that we can improve the quality of service that they are providing to their residents. *We believe the factors discussed above are equally applicable to each of our segments with respect to acquiring new customers and increasing revenues*.

Healthcare Servs. Grp., Annual Report (Form 10-K) at 21 (Feb. 25, 2021) (emphasis added).

40.     As a result, it was critical for the Company's growth for Defendants to monitor and control HCSG's expenses – particularly, labor and supply costs. For the Housekeeping segment, operating performance was overwhelmingly impacted by labor costs, which management analyzed as a percentage of revenues in order to normalize and evaluate such costs to reflect changes in the Company's growth. Labor costs accounted for approximately 81% of Housekeeping revenues in FY 2014; 80% of Housekeeping revenues in FY 2015; 80.2% of Housekeeping revenues in FY 2016; 80.1% of Housekeeping revenues in FY 2017; and 78.8% of Housekeeping revenues in FY 2018. While labor costs comprise a smaller proportion of expenses for the Dietary segment, they still constitute a majority of the Company's expenses, accounting for 51% of Dietary revenues in FY 2014; 53% of Dietary revenues in FY 2015; 53.8% of Dietary revenues in FY 2016; 56.6% of Dietary revenues in FY 2017; and 57.2% of Dietary revenues in FY 2018.

41.     The Individual Defendants manipulated the primary driver of the Company's expenses – labor costs – to materially alter the Company's reported EPS. The Individual Defendants failed to include actual labor costs to falsely project additional profitability, manipulating expenses and thereby releasing false and misleading statements to shareholders.

42.     HCSG has historically been a middle-to-low margin business. As such, even small differences in net income could result in material changes to the Company's EPS. For instance, a reduction in the Company's net income by just $62,000 in Q4 2016 would have had the effect of

shaving eight one-hundredths of a cent off HCSG's EPS, resulting in a rounding-down of reported EPS and causing the Company to miss EPS targets by a penny.  As a result, the Individual Defendants were able to meet analysts' EPS target by "reducing" labor costs at each of the facilities serviced by HCSG by an average of less than $21 at each facility per quarter.  Alternatively, the Individual Defendants could have achieved the same result by directing any one of their regional managers to direct their 500 hourly employees to work one and a half days less per quarter.  The Individual Defendants did engage in such, and likely other, manipulations of labor cost to achieve the statistically improbable EPS performance reported in the financial statements challenged herein.

### B.    HCSG's Operational Management and Reporting Systems

43.    HCSG's operational reporting system manages individual facility-level operations at a "district" level (with approximately 8-12 facilities in each district).  Each district reports up to both "regional" and "divisional" levels that, in turn, report up to the main "corporate" level at the Company's headquarters in Bensalem, Pennsylvania.  The reporting link between the Company's Divisional Vice Presidents at the "divisional" level, and senior management, including the Individual Defendants and other personnel at the "corporate" level, is a crucial interface at the Company.  As each of the Company's Annual Forms 10-K from fiscal years 2001 through 2015 note, with regard to HCSG's "Operational Management Structure," the purpose of these reporting lines was to "contain or control certain housekeeping, laundry, linen, facility maintenance and dietary service costs on a continuing basis."

44.    Since at least April 2012, family members of Defendants McCartney, Wahl, and McKee (who are themselves related to each other) held senior-level positions at the Company, including Division Vice President roles.  These individuals include Kevin P. McCartney, the

brother of Defendant McCartney, who began working for the Company in 1998; Stephen Newns, the brother-in-law of Defendant McCartney and Bryan McCartney, who joined the Company in 1995; and James R. Bleming, the brother-in-law of Bryan McCartney, who joined the Company in 1992.  As a result of these familial connections, Defendants McCartney, Wahl, and McKee had an additional channel of access to information at the Company's divisional level above the normal reporting lines.  These familial connections also allowed the Individual Defendants an enhanced degree of control over the financial and operational affairs of the Company's operations.

45.     The Individual Defendants ultimately control the Company's financial and operational matters at the corporate level in the Company's headquarters.  As stated in the Company's Form 10-K for fiscal year 2020, filed February 25, 2021, "Our corporate headquarters provides centralized financial management and support, legal services, human resources management and other administrative services to the Housekeeping and Dietary business segments."

### C.     Significance of EPS and Quarterly Consensus Estimates

46.     EPS is an important financial metric which measures a company's net profit divided by the shares of its outstanding common stock.  The resulting number serves as an indicator of a company's profitability, where the higher a company's EPS is, the more profitable it is considered to be.

47.     The Individual Defendants caused HCSG to manipulate over a decades' worth of EPS results, overstating this metric in order to artificially inflate both HCSG's performance metrics and shareholders' perception of the Company's performance.  Analysts who estimated HCSG's performance likely took the Company's consistent manipulation into account in

determining their own EPS estimates, further compounding the false and misleading information emanating from the Individual Defendants.

48.     EPS results are material for shareholders to gauge a company's financial performance because it helps to determine whether a company's profitability has improved each quarter.  If a company misses its quarterly EPS targets, its stock price can be negatively affected as shareholders gauge whether management can effectively meet operational goals.  An EPS "miss" of even pennies can thereby result in major negative stock price movement as shareholders reevaluate their assumptions with respect to management's credibility and the company's financial stability.

49.     The Individual Defendants caused HCSG to release quarterly financial results to investors heavily focused on EPS figures.  For instance, on a financial call to discuss the Company's Q1 2017 financial results with shareholders, the Company began by noting that, "[n]et income for the quarter increased to $22 million or $0.30 per share, and both net income and earnings per share for the quarter were company records."  The Individual Defendants continued to similarly stress record results for EPS for a course of years.

50.     The Individual Defendants were able to position HCSG as a stable, consistent performer in a volatile market by consistently manipulating EPS to project an image of a company which routinely met or beat analyst estimates.  For instance, an October 11, 2016, Global Research analyst report from UBS Group, AG ("UBS") noted "another strong quarter for HCSG," noting first and foremost that HCSG's EPS were tracking expectations, because revenues were "in-line with both UBS [and] consensus [estimates]."  Based on these factors, UBS reiterated its "buy" rating for the stock, with a $48 price target that "assume[d] HCSG shares trade at 38x our 2017 EPS estimate."

## V.    INTERNAL COMPANY OPERATIONS ALLEGED IN THE SECURITIES ACTION PER CONFIDENTIAL WITNESSES

51.    The allegations in the Securities Action include detailed information about the Company's internal reporting lines for financial performance and budgeting metrics, based on information provided through interviews with four former HCSG employees, including regional directors and district managers.   Specifically, the four confidential witnesses provided the following information regarding the Company's internal practices:

### A.    Confidential Witness 1

52.    Confidential Witness 1 ("CW1") worked as a Regional Manager for the Company from January 2011 to March 2017, when CW1 voluntarily resigned.  CW1 was responsible for a territory of over 50 facilities at which the Company was providing housekeeping services, with 10 to 12 employees working at each facility.

53.    According to CW1, the Company tracked each facility's monthly financial performance.  Based on CW1's position with the Company, CW1 was aware that the Company's headquarters, and the Vice President of Operations to whom CW1 reported, set the annual budget for each facility.  CW1 recalls that the budget numbers did not change much year to year.  Each facility incurred expenses for labor, supplies, payroll, and insurance.  Budget variables included labor, overtime pay, wage increases, and equipment repairs.  According to CW1, labor costs were, by far, the most significant expense item for the Company.  CW1 recalled that the corporate headquarters was particularly interested in reducing payroll expenses since they were the "most expensive" cost component.

54.    CW1 explained that facility managers prepared monthly "Profit and Loss Statements" for each facility.  These line-item reports contained the actual monthly results, year-to-date results, and budgeted amounts.  The reports also included variances between actual results

and budgeted amounts.  CW1 prepared Profit and Loss Statements for each of the facilities that he managed and "rolled" them up into one report that he went to the Vice President of Operations. The Vice President of Operations consolidated the Profit and Loss Statements with those of other facilities in the Vice President's territory.  The Vice President of Operations then sent the consolidated results to the Company's corporate headquarters.

55.     CW1 recalled that the corporate headquarters returned a report to CW1 and other regional managers called a Monthly Operating Statement, which CW1 likened to a profit and loss statement.  Monthly Operating Statements included line-by-line financial details on a regional and facility basis, including eight categories of payroll expenses.

56.     CW1 explained that the Monthly Operating Statements contained information about the wages for each facility's hourly workers who performed laundry and housekeeping services.  The Monthly Operating Statements also included payroll expenses for management, overtime, vacation and sick time, payroll taxes, insurance, and a category for "Payroll – Accrued." CW1 recalled that the accrued payroll category generally related to hourly employee wages that have been earned but not paid as of the date of the report, due to the timing of pay periods that did not coincide with month's end.  In the Monthly Operating Statements, actual amounts for each revenue and expense item were compared to budgeted amounts, with indication of the amount that each item was over or under budget.

57.     CW1 stated that the actual amounts paid to the Company's hourly workers shown in the Monthly Operating Statements were typically less than the budgeted amounts.  According to CW1, the Company intentionally understaffed facilities to keep labor expenses below budgeted amounts to meet financial goals, while the quality of service and patient care suffered as a consequence.  The cost reduction was achieved, in part, by simply cutting, without apparent

operational justification – and, in fact, contrary to the interests of the Company's clients and the vulnerable populations they serve – the number of hours worked by hourly employees who CW1 recalled were paid at or near the minimum wage.

58.     For example, CW1 received orders from the Vice President of Operations to "send people home" for at least the last two weeks of the year so that the Company did not have to pay those employees' wages or overtime.  This practice occurred every year that CW1 worked for the Company, from January 2011 to March 2017.  Orders to reduce the hourly workforce would start coming around Thanksgiving of each year.  CW1 understood that, in ordering this action, the Vice President of Operations was acting at the discretion of leadership at the corporate level of the Company.  CW1 knew that, at a minimum, the end-of-year eliminations of hourly personnel applied to Texas-based employees and the plans were communicated on conference calls in which CW1 participated, along with all Texas Regional Managers, a Divisional Vice President, and a Human Resources Manager.  To make up the staffing shortfall caused by the reduction of the hourly workforce, salaried managers and directors filled in for the hourly employees.  As an example of how this might work, CW1 provided that, instead of four hourly employees completing certain cleaning services, two (salaried) managers would perform those cleaning services.  This practice of relying on salaried "managers" to perform lower-level work temporarily lowered variable labor costs – since the "manager" salaries were, in essence, a fixed cost, compared to the variable costs associated with the hourly workforce – and also resulted in a lower quality of care.  According to CW1, as a result of these staffing moves, the Company was not providing the services that it agreed to in its contracts.

59.     CW1 last reported to a Vice President of Operations, David Hurlock ("Hurlock").  CW1 knew of Hurlock through CW1's position at the Company and had contact with him,

including on monthly and quarterly conference calls.  CW1 understood that Hurlock was CW1's region's connection to the Company's corporate headquarters in Bensalem, Pennsylvania.  CW1 understood, through CW1's position at the Company, that Hurlock and the Company's Divisional Vice Presidents were part of a tightly knit "good old boys' club" that took "care of each other" and included the Company's senior management at the corporate headquarters.  While CW1 did not believe that Hurlock was related to the McCartney family by marriage or otherwise, CW1 was aware that Hurlock was close and "tight" with the Company's senior corporate leadership, including Defendant Wahl.  Confirming CW1's understanding of the close relationship between Hurlock and Defendant Wahl, in July 2017, Hurlock was promoted to the position of Executive Vice President and COO at the Company, a position once held by Defendant Wahl.  (On July 23, 2019, however, the Company announced that Hurlock was leaving the Company by the end of July.  No explanation was provided for Hurlock's departure.)  On Hurlock's personal profile page on the professional networking website, LinkedIn.com, Hurlock touts his experience as COO in several areas, including: "[s]pearheaded the implementation of operations excellence efficiencies through labor models that ultimately increased profits," and "[w]orked with Executive team to understand and anticipate hiring and development needs against the capabilities needed to deliver business objectives; prepared updated workforce plans and forecasts that supported overall business goals."

### B.     Confidential Witness 2

60.     Confidential Witness No. 2 ("CW2") worked in the Northeast and Midwest as a District Manager for the Company's dietary segment prior to the Relevant Period through August 2015, when CW2 voluntarily left the Company.  While CW2 primarily reported to a Regional Manager who, in turn, reported to a Divisional Vice President, CW2 communicated directly with

the Divisional Vice President about various matters. CW2 understood that the Divisional Vice President reported to the Company's corporate headquarters.

61.     Each month, CW2 prepared a report called "Monthly Projections" for CW2's district and two other districts. The Monthly Projections reports contained various financial data from the facilities under CW2's management, including earned revenue, accrued revenue, accrued payroll expenses, and other expense information. CW2 sent these Monthly Projections reports to the Regional Manager who, in turn, sent the Monthly Projections to the Divisional Vice President for transmittal to the Company's corporate headquarters.

62.     In preparing the Monthly Projections report, CW2 used payroll information to calculate an amount of accrued payroll or labor expenses from that particular month. According to CW2, the monthly accrued labor expense was not simply a basic dollar amount of unpaid wages owed as of month end. Rather, the amount of the accrued labor expense was calculated pursuant to a formula required by the corporate headquarters. CW2 understood that the formula was intended to, among other things, account for the timing of employee pay periods that might span two monthly reporting periods. CW2 believed that the amounts of accrued labor expenses that CW2 reported in Monthly Projections reports (as well as all other information provided in each Monthly Projections report) were accurate, based on the information that CW2 had from the facilities under CW2's management and under the Company's formula for reporting that information.

63.     CW2 recalled that, every month, following the submission of the Monthly Projections reports, District Managers, including CW2, received a report back called the "Monthly Operating Statement." CW2 believed that the Monthly Operating Statements were generated at

the Company's headquarters. According to CW2, the Monthly Operating Statement was the final

monthly accounting for each division.

64.     According to CW2, "consistent and significant" differences routinely existed

between the Monthly Projections reports and the Monthly Operating Statements sent back by

corporate headquarters. CW2 explained that, for all of the approximately ten years that CW2 was

employed at the Company, differences existed every month between the Monthly Projections and

the Monthly Operating Statements. Among other things, CW2 recalled that the Monthly Operating

Statements included payroll accruals that differed significantly from those that CW2 had

previously submitted in the Monthly Projections reports.

65.     According to CW2, the different accrued payroll expenses in the Monthly

Operating Reports "never made any type of sense" and bore no relationship to the actual

circumstances of the accrued labor expenses that CW2 saw at the facilities in CW2's district. CW2

recalled that, for CW2's facilities, payroll accruals in the Monthly Operating Statements could be

adjusted both downward and upward from the amounts that CW2 had reported, with "no rhyme or

reason" to those changes apparent to CW2 at the time. CW2 recalled frequently discussing the

disconnect between the Monthly Operating Statements and the Monthly Projections reports with

colleagues, including two other district managers in the dietary segment. According to CW2, CW2

and the other two district managers would examine every line item in the Monthly Operating

Statements and would discuss the differences between Monthly Projections reports and the

Monthly Operating Statements, including, but not limited to, changes to payroll accruals.

66.     In addition to CW2's informal discussions with other district managers, according

to CW2, there were three or four conference calls held per month to discuss the differences

between the Monthly Projections reports and the Monthly Operating Statements. CW2 explained

that participants on the calls included District Managers, Regional Managers, and Divisional Vice Presidents.  Each conference call included approximately 15 to 20 District Managers.  On these calls, CW2 and other District Managers discussed the numbers that they submitted in Monthly Projections reports.  According to CW2, the discussions on these conference calls included issues related to changes made to the Monthly Projections reports that had been submitted by other District Managers throughout the Company.  CW2 also recalled raising concerns about the discrepancies between Monthly Projections reports with Regional Managers and with the Divisional Vice President with whom CW2 occasionally communicated.  CW2 did not recall ever receiving an explanation for the discrepancies.

### C.      Confidential Witness 3

67.      Confidential Witness 3 ("CW3") worked for the Company from the mid-1990's to June 2015.  CW3 worked as a Regional Director in the Midwest at the time of CW3's departure.

68.      According to CW3, CW3 understood from nearly 20 years of experience with the Company, including through attendance at quarterly meetings in Philadelphia and on periodic conference calls, that the Company's accounting function was "small and controlled" by the Company's senior management at the Bensalem, Pennsylvania headquarters, including the Company's CFO (Defendant Shea) and the Corporate Controller.  According to CW3, Defendant Shea is a family friend of the McCartney family.

69.      CW3 also believes, based on having worked for nearly two decades at HCSG, that the divisional level at the Company was "incestuous" given that McCartney's brothers and a son-in-law worked in divisional management.

### D.    Confidential Witness 4

70.    Confidential Witness 4 ("CW4") worked as a Director of Food Services at a Genesis Healthcare-owned facility in Pennsylvania from 2012 through October 2017.  Genesis Healthcare operates a chain of long-term care facilities and is one of the Company's most significant customers.  CW4 was initially a Genesis Healthcare employee but became an HCSG employee in April 2017, as part of a contract whereby Genesis Healthcare outsourced its dietary services to the Company.

71.    CW4 was responsible for managing approximately 12 employees.  At the same time that CW4 became an HCSG employee, the 12 employees who reported to CW4 also became employees of the Company.

72.    According to CW4, starting immediately after the transition to management under HCSG, CW4 learned that significant portions of the hourly employees under CW4's supervision would periodically not be paid by the Company for extended periods of time.  CW4 heard of this from hourly employees who complained about not receiving anticipated paychecks.  Initially, these complaints came from younger part-time workers, including working students who did not receive their paychecks on time.  The next personnel affected were the two highest-paid line cooks on CW4's staff.  Eventually, CW4 recalls that the practice was extended to all of the employees under CW4's supervision.

73.    CW4 recalled that about half of the employees would be paid as scheduled while the others would not and then, after approximately three to four payroll cycles, the situation would be reversed: the employees who had not been paid were paid, and the employees that had been paid were not paid.  Employees who had not been paid for several weeks would, when their pay resumed, receive an initial large check, ostensibly to make up for the prior wages owed to them

21

(although it was not clear whether the larger checks, in fact, accurately reflected the full amounts owed to the employees who may have been owed additional amounts reflective of overtime or holiday hours at higher hourly pay rates). CW4 described this practice as occurring in "spurts" or "start and stop" for hourly employees throughout the entire time that CW4 as an HCSG employee.

74.    CW4 stated that non-payment or late payment of employees' wages never occurred during the time that CW4 was employed by Genesis Healthcare. The practice only occurred after CW4 and the hourly employees became employees of HCSG.

75.    According to CW4, CW4 understood that certain employees whose pay was withheld by the Company filed complaints with the state's department of labor, but CW4 did not know the outcome of those complaints.

76.    CW4 reported the non-payment of wages issue to CW4's supervisor at the Company. CW4 was told by the supervisor that the issue was reported up to the Company's headquarters in Bensalem, but that no one from the corporate office called back to discuss the issue with the supervisor. Frustrated with the lack of response and concerned about the financial well-being of CW4's employees, CW4 directly called the human resources and accounting departments at the Company's headquarters in Bensalem to report the issue and ask for an explanation. CW4 never received an explanation from anyone at the Company.

77.    CW4 understood from conversations with colleagues who held similar dining services manager positions at other of the Company's facilities that the same wage withholding practices occurred at these other facilities.

78.    CW4's descriptions of the unusual manner in which hourly employees' wages were withheld at the Company were further corroborated by former HCSG employees who posted on Company-specific message boards on Indeed.com, a job search website which includes Company

reviews by current and former employees.  There are at least seven reviews from current or former HCSG employees on Indeed.com dated during the Relevant Period, from November 2017 to January 2019, that describe similar conduct at other facilities serviced by HCSG.  A former cook from Leominster, Massachusetts wrote on November 2, 2017: "They don't pay right. Managements would tell me to 'suck it up' when I'll be missing over $300 from my paychecks. This happened multiple times."  A former employee for the Company's dietary segment from Charleston, West Virginia similarly noted on January 20, 2018: "Paychecks are almost always short and holiday pay is time and a half but they include it in your hourly pay and add the 'half' separate."  A floor technician based in Bensalem, Pennsylvania wrote on August 4, 2018: "hardly get paid on time.  [M]y last 2 pay checks wasn't [sic] paid on time.  [T]ook a month to receive my last pay."  On August 13, 2018, a former account manager/environmental director based in Allen, Texas wrote: "I actually had to go file with the labor board because they didn't pay me my check. And come to find out they have over 10 cases against them for the same thing.  Not paying their employees."  On October 16, 2018, a former account manager based in Vermont wrote, "employees [are] regularly short-changed in their paychecks."  On January 2, 2019, a former dietary aide from Illinois wrote, "my paycheck and hours were continuously cut."  A former dietary cook based in Phoenix, Arizona wrote on January 29, 2019: "I was there for 3 months and never got paid for all my hours worked.  They still owe me for hours I worked."  The same former dietary cook continued, "[t]he management would always try to change your hours would not pay you for all hours worked. . . ."  Combined with the allegations by the Confidential Witnesses in the Securities Action, these statements further demonstrate that the Company engaged in aggressive and potentially unlawful practices with respect to labor expenses in conjunction with the Company's efforts to manipulate its reported EPS.

## VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

79.   As alleged in related securities fraud class action claims pending against the Company in this District, in the Securities Action, the Individual Defendants caused HCSG to manipulate and routinely overstate its EPS to meet consensus estimates and project a false image of long-term consistency over the course of a decade.

80.   The Individual Defendants knowingly caused or were reckless in their failure to detect and curtail, HCSG's manipulation of its financial metrics to meet financial expectations. The Individual Defendants knew or were reckless in their failure to monitor the Company's manipulated net income and related calculations, allowing HCSG to round up crucial metrics to ensure EPS would avoid falling short of analysts' EPS targets.  This manipulation allowed HCSG to meet or beat analyst estimates over the course of more than 40 consecutive quarters, with the exception of three quarters in which "extraordinary" matters required the Company's reported EPS to fall short of analysts' expectations.

81.   Indeed, HCSG routinely met consensus EPS estimates precisely to the penny as a result of the Individual Defendants' manipulation.  On March 22, 2017, Monocle published the Monocle Report, describing the statistically improbable manner in which HCSG narrowly met consensus EPS targets through "strategic rounding" for more than a decade.

82.   The Monocle Report included a review of a decade's worth of Company earnings reports and concluded that HCSG exhibited "an odd and concerning pattern, that of 'strategic rounding' of quarterly earnings per share."  The Monocle Report further stated that the Individual Defendants were likely responsible, finding "[s]trong evidence suggests earnings management over the long term is likely at least partially responsible for HCSG's steadily increasing valuation to the current nosebleed level."  Monocle's review also concluded with the finding that the

Company's financial reports "signal[] an aggressive approach to accounting that increases exposure to restatement risk, enforcement proceedings and securities fraud claims." Such an approach to the Company's accounting, which did in fact increase systemic regulatory, litigation, and financial reporting risks, was inconsistent with the Individual Defendants' fiduciary duties to the Company and its shareholders.

83.    The Monocle Report explained its analysis as to why HCSG's reported financial metrics evidenced a pattern of "strategic rounding" designed to meet specific EPS results as follows:

**Strategic Rounding of Quarterly EPS**

Allow us to explain. In any given quarter, a company's diluted EPS is simply the quotient of the company's quarterly net income and the average number of diluted shares outstanding. If a company is not actively manipulating either the numerator in the equation (by making changes to specific cash or accrual expense items, and/or by making changes to how revenue is recognized) or the denominator in the equation (by buying or issuing shares), then a company's EPS in any given quarter, expressed in cents per share, should have an equal chance of rounding down to the nearest penny as rounding up to the nearest penny.

An analysis of all stocks in the S&P500 over the last number of years shows this to be the case, with companies' quarterly EPS figures rounding down to the nearest penny roughly the same number of times that they round up. For example, over the last 10 years, Apple's (NASDAQ:AAPL) quarterly EPS has rounded up 18 times and has rounded down 22 times. Most other companies' rounding history is similarly random.

And then there is Healthcare Services Group.

On February 7, 2017, HCSG reported results for the three months and year ended December 31, 2016. In the fourth quarter, HCSG's diluted EPS was $0.28. However, as HCSG's net income was $20,299,000 and the diluted weighted average number of HCSG's common shares outstanding during the quarter was 73,590,000, then HCSG's diluted EPS, more precisely, was $20,299,000/73,590,000 shares, or $0.2758. In other words, had HCSG's net income been a mere $62,000 less, then HCSG's diluted EPS would have been less than $0.2750, and would have, therefore, rounded down to $0.27, giving investors the disappointment of a $0.01 EPS miss.

25

In isolation, this good fortune of having EPS round up to $0.28 instead of down to $0.27 could easily be explained by simple luck of the draw.  However, consider HCSG's earnings reports going back to the first quarter of 2006:

|  | Net income | Diluted weighted average shares | Earnings per share (A) | Rounded EPS (B) | B-A |
|---|---|---|---|---|---|
| **Q416** | 20299000 | 73590000 | 0.2758 | 0.28 | 0.0042 |
| **Q316** | 19711000 | 73592000 | 0.2678 | 0.27 | 0.0022 |
| **Q216** | 18760000 | 73316000 | 0.2559 | 0.26 | 0.0041 |
| **Q116** | 18626000 | 73014000 | 0.2551 | 0.26 | 0.0049 |
| **Q415** | 9134000 | 72903000 | 0.1253 | 0.13 | 0.0047 |
| **Q315** | 17086000 | 72691000 | 0.2350 | 0.24 | 0.0050 |
| **Q215** | 16288000 | 72286000 | 0.2253 | 0.23 | 0.0047 |
| **Q115** | 15516000 | 72159000 | 0.2150 | 0.22 | 0.0050 |
| **Q414** | 15472000 | 71722000 | 0.2157 | 0.22 | 0.0043 |
| **Q314** | -22182000 | 70671000 | -0.3139 | -0.31 | 0.0039 |
| **Q214** | 13921000 | 71206000 | 0.1955 | 0.20 | 0.0045 |
| **Q114** | 14639000 | 71072000 | 0.2060 | 0.21 | 0.0040 |
| **Q413** | 5452000 | 70898000 | 0.0769 | 0.08 | 0.0031 |
| **Q313** | 13790000 | 70531000 | 0.1955 | 0.20 | 0.0045 |
| **Q213** | 12933000 | 69370000 | 0.1864 | 0.19 | 0.0036 |
| **Q113** | 14954000 | 69361000 | 0.2156 | 0.22 | 0.0044 |
| **Q412** | 12798000 | 68988000 | 0.1855 | 0.19 | 0.0045 |
| **Q312** | 11517000 | 68635000 | 0.1678 | 0.17 | 0.0022 |
| **Q212** | 11320000 | 68228000 | 0.1659 | 0.17 | 0.0041 |
| **Q112** | 8578000 | 68085000 | 0.1260 | 0.13 | 0.0040 |
| **Q411** | 10565000 | 67705000 | 0.1560 | 0.16 | 0.0040 |
| **Q311** | 9996000 | 67530000 | 0.1480 | 0.15 | 0.0020 |
| **Q211** | 9828000 | 67545000 | 0.1455 | 0.15 | 0.0045 |
| **Q111** | 7767000 | 67454000 | 0.1151 | 0.12 | 0.0049 |
| **Q410** | 9123000 | 67232000 | 0.1357 | 0.14 | 0.0043 |
| **Q310** | 9169000 | 44719000 | 0.2050 | 0.21 | 0.0050 |
| **Q210** | 8721000 | 44652000 | 0.1953 | 0.20 | 0.0047 |
| **Q110** | 7428000 | 44659000 | 0.1663 | 0.17 | 0.0037 |
| **Q409** | 6566000 | 66705000 | 0.0984 | 0.10 | 0.0016 |
| **Q309** | 8225000 | 44334000 | 0.1855 | 0.19 | 0.0045 |
| **Q209** | 7815000 | 44262000 | 0.1766 | 0.18 | 0.0034 |
| **Q109** | 7736000 | 44073000 | 0.1755 | 0.18 | 0.0045 |
| **Q408** | 7283000 | 43948000 | 0.1657 | 0.17 | 0.0043 |
| **Q308** | 5522000 | 43980000 | 0.1256 | 0.13 | 0.0044 |
| **Q208** | 6953000 | 43962000 | 0.1582 | 0.16 | 0.0018 |
| **Q108** | 6857000 | 44213000 | 0.1551 | 0.16 | 0.049 |
| **Q407** | 7305000 | 44033000 | 0.1659 | 0.17 | 0.0041 |

26

| Q307 | 7299000 | 43969000 | 0.1660 | 0.17 | 0.0040 |
| Q207 | 7524000 | 29140000 | 0.2582 | 0.26 | 0.0018 |
| Q107 | 7450000 | 29108000 | 0.2559 | 0.26 | 0.0041 |
| Q406 | 7227000 | 28986000 | 0.2493 | 0.25 | 0.0007 |
| Q306 | 6564000 | 28760000 | 0.2282 | 0.23 | 0.0018 |
| Q206 | 6203000 | 28691000 | 0.2162 | 0.22 | 0.0038 |
| Q106 | 5676000 | 28620000 | 0.1983 | 0.20 | 0.0017 |

Remarkably, every single quarter over the past 11 years has seen HCSG's quarterly earnings per share round up rather than round down to the nearest penny. Coincidentally, this strange pattern began just a few quarters after McCartney's two sons-in-law joined the company.

To put the magnitude of the improbability that this is the result of anything but the active management of the company's EPS, consider this: since the odds of a company's EPS rounding up to the nearest penny are theoretically the same as rounding down, HCSG's history of EPS rounding up is tantamount to HCSG flipping heads on a coin toss 44 straight times, the odds of which are a staggering *1 in 17.6 trillion*.

If one peruses the right-hand column of this table though, one will notice that more times than not, HCSG's quarterly diluted EPS rounded up by more than 0.4 cents. The sum of the amounts by which HCSG's 44 diluted EPS figures rounded up is a shockingly large 16.59 cents. If HCSG's quarterly diluted EPS figures were, in fact, randomly derived over the past 11 years, then the odds of this occurring are roughly *1 in 600 quadrillion*.

\* \* \*

One possible reason why HCSG may have done this is to facilitate progressively higher and higher valuation multiples for the stock (as highlighted above), which would be a good thing for anybody seeking to sell some of their HCSG stock. It is interesting to note, then, that Chairman Daniel McCartney has been an aggressive seller of HCSG stock in recent years – since July 2015, McCartney has sold $23.4 million worth of stock at an average price of $36.61, and has gifted another $4.2 million worth of stock at an average price of $37.61. If we were shareholders of HCSG who bought the stock in recent years in part because of HCSG's history of rarely disappointing the Street through EPS misses, we might be somewhat bitter that the chairman of the company has been selling the stock at high valuations that have come about, at least in some part, because of a pattern of quarterly EPS that appears to have been manipulated.

84.     On April 24, 2020, this Court sustained claims in the Securities Action under Sections 10(b) and 20(a) of the Exchange Act against Defendants McCartney, McKee, Shea, Wahl, and the Company in their entirety. No. 19-01227, ECF No. 42. Those false and misleading

statements included extensive disclosures made by the Company and certain individual defendants from April 8, 2014 to March 4, 2019. The statements sustained over defendants' motion to dismiss included the following false and misleading statements and omissions.

85. Approximately three weeks after the Monocle Report was published, McCartney, the Company's founder and Chairman since its inception, informed the Company's Board that he would not stand for reelection at the Company's next annual meeting. McCartney's term as Chairman ended on May 31, 2017.

**A.  FY 2014 False and Misleading Statements Sustained in the Securities Action**

86. On April 8,2014, the Company issued a press release to announce its quarterly results for Q1 2014. The press release stated, "[n]et income for the three months ended March 31, 2014 was $14,639,000 or $0.21 per basic and per diluted common share, compared to the three months ended March 31, 2013 net income of $14,954,000 or $0.22 per basic and per diluted common share." The press release included Consolidated Statements of Income, which also reported basic and diluted EPS of $0.21. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release. The press release listed Defendants McCartney and Wahl as "Company Contacts."

87. The following day, on April 9, 2014, the Company hosted an earnings call to discuss its Q1 2014 results. Defendants McCartney, Wahl, and McKee participated on behalf of the Company. Defendant Wahl noted that, "[n]et income came in at $14.6 million, or $0.21 per share, compared to $14.9 million, or $0.22 per share, for the first quarter of 2013."

88. On April 24, 2014, the Company filed its quarterly report on Form 10-Q for Q1 2014 with the SEC ("Q1 2014 Form 10-Q"). Defendants McCartney and Shea signed the Q1 2014 Form 10-Q. With respect to EPS, the Company reiterated its previously reported net income for

Q1 2014 and reported earnings per basic and per diluted common share of $0.21.  With respect to how the Company calculated its EPS, HCSG stated, "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average common shares outstanding for the period.  Diluted earnings per common share reflect the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options."  HCSG further explained that, "[b]asic net earnings per share are computed using the weighted-average number of common shares outstanding.  The dilutive effect of potential common shares outstanding is included in diluted net earnings per share."

89.     With respect to "Disclosure Controls and Procedures," Defendants McCartney and Shea noted that, "[b]ased on their evaluation as of March 31, 2014, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) are effective."

90.     The Q1 2014 Form 10-Q included a SOX Certification signed by Defendants McCartney and Shea.  The SOX Certifications stated, in part, the following:

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)   Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors:

a)   All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

91.   On July 8, 2014, the Company issued a press release to announce its quarterly results for the three months ended June 30, 2014 ("Q2 2014"). The Company noted that, "[n]et income for the three months ended June 30, 2014 was $13,921,000 or $0.20 per basic and per diluted common share, compared to the three months ended June 30, 2013 net income of

$12,933,000 or $.0.19 per basic and per diluted common share."  The press release included Consolidated Statements of Income, which also reported that basic and diluted EPS of $0.20. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release.  The press release listed Defendants McCartney and Wahl as "Company Contacts."

92.     On July 9, 2014, the Company held an earnings call to discuss its Q2 2014 results. Defendants McCartney, Wahl, and McKee participated on behalf of the Company.  Defendant Wahl touted the Company's Q2 2014 EPS, noting that, "[n]et income for the quarter came in at $13.9 million, or $0.20 per share, compared to the $12.9 million or $0.19 per share for the prior year's corresponding quarter."

93.     On July 24, 2014, the Company filed its Q2 2014 quarterly result on Form 10-Q with the SEC ("Q2 2014 Form 10-Q").  Defendants McCartney and Shea signed the Q2 2014 Form 10-Q.  The Q2 2014 Form 10-Q contained Consolidated Statements of Comprehensive Income, which reiterated the Company's previously reported net income and reported basic and diluted EPS of $0.20 for the three months ended June 30, 2014.  With respect to EPS calculations, the Form 10-Q also noted that, "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average common shares outstanding for the period.  Diluted earnings per common share reflect the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options." The Q2 2014 Form 10-Q further noted that, "[b]asic net earnings per share are computed using the weighted-average number of common shares outstanding.  The dilutive effect of potential common shares outstanding is included in diluted net earnings per share."

94.     With respect to their "Evaluation of Disclosure Controls and Procedures," Defendants McCartney and Shea noted that, "[b]ased on their evaluation as of June 30, 2014,

pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

95.     The Q2 2014 Form 10-Q included a SOX Certification that was substantially the same as the SOX Certification alleged above in ¶90.

96.     On October 14, 2014, the Company announced its earnings results for the three months ended September 30, 2014 ("Q3 2014").  The Company reported a net loss for the three months ended September 30, 2014 of $22,182,000 or a $0.31 loss per basic and per diluted common share.

97.     On October 15, 2014, the Company held an earnings call to discuss its Q3 2014 results.  Defendants McCartney, Wahl, and McKee participated on behalf of the Company. Defendant Wahl touted the Company's Q3 2014 EPS, noting that, "[b]oth quarterly and year-to-date September revenues were company records.  Excluding the one-time charges [associated with above-noted events], income would have been over $15 million or $0.21 to $0.22 per share assuming an effective tax rate of 35% to 38% compared to the $13.8 million or $0.20 per share in the third quarter of last year."  Notwithstanding the results and miss, these statements were false and misleading because the Individual Defendants rounded the Company's EPS calculations to avoid having a larger negative result and wider EPS miss.

98.     On October 30, 2014, the Company filed its Q3 2014 quarterly results on Form 10-Q with the SEC ("Q3 2014 Form 10-Q").  Defendants McCartney and Shea signed the Q3 2014 Form 10-Q.  The Q3 2014 Form 10-Q contained Consolidated Statements of Comprehensive Income, which reported a $22,182,000 net income loss and the $0.31 basic and diluted EPS loss for the three months ended September 30, 2014.  With respect to EPS calculations, the Form 10-

Q also noted that, "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average common shares outstanding for the period. Diluted earnings per common share reflect the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options."  The Q3 2014 Form 10-Q further noted, "[b]asic net earnings per share are computed using the weighted-average number of common shares outstanding.  The dilutive effect of potential common shares outstanding is included in diluted net earnings per share."

99.     With respect to their "Evaluation of Disclosure Controls and Procedures," the Q3 2014 Form 10-Q noted that, "[b]ased on their evaluation as of September 30, 2014, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) are effective."

100.    The Q3 2014 Form 10-Q included a SOX Certification that was substantially the same as the SOX certification alleged above in ¶90.

101.    On February 3, 2015, the Company issued a press release to announce its quarterly results for the three months ended December 31, 2014 ("Q4 2014"), as well as for FY 2014.  The Company reported net income of $15,472,000 or $0.22 per basic and diluted common share for Q4 2014.  The press release included Consolidated Statements of Income, which also reported basic and diluted earnings per common share of $0.22 for Q4 2014.  Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release.  The press release listed Defendants McCartney, Wahl, and McKee as "Company Contacts."

102.    On the following day, February 4, 2015, the Company held an earnings call to discuss its Q4 2014 and FY 2014 results.  Defendants McCartney, Wahl, and McKee participated

on behalf of the Company.  Defendant McKee reported that net income for Q4 2014 was $15.4 million or $0.22 per share.

103.    On February 19, 2015, the Company filed its Annual Report for FY 2014 on Form 10-K with the SEC ("2014 Form 10-K").  In a summary of quarterly financial data, the 2014 Form 10-K reiterated that, for Q4 2014, net income was $15,472,000 and that basic and diluted EPS were $0.22.  Defendants McCartney, Shea, Wahl, and McBryan signed the 2014 Form 10-K.

104.    With respect to "Disclosure Controls and Procedures," the 2014 Form 10-K noted that, "[i]n accordance with Exchange Act Rules 13a-15 and 15a-15, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2014."

105.    The 2014 Form 10-K included a SOX Certification that was substantially the same as the SOX Certification alleged above in ¶90.

106.    The foregoing statements were false and misleading when made and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular:

a.    Starting prior to April 8, 2014 and through at least December 31, 2018 (the "Relevant Period"), the Individual Defendants made the Company falsely appear to meet or beat analysts' targets for quarterly EPS consistently.  As alleged at ¶¶86-107 herein, the Individual Defendants overstated the Company's quarterly EPS in Q1 2014, Q2 2014, and Q3 2014 by continually manipulating net income to generate EPS results that would have a third digit

(representing tenths of a cent) that would permit the rounding up of reported EPS to artificially avoid falling short of analysts' consensus EPS target for the Company, and in Q3 2014, rounded EPS to minimize the amount of its earnings miss.  The Individual Defendants therefore knowingly or recklessly overstated the Company's EPS to meet analyst estimates and falsely perpetuate the Company's reputation for stable and consistent financial performance.

b.      As a result, the Individual Defendants' statements about the Company's net income and EPS, including the reported quarterly results and the manner in which the Company calculated basic and diluted EPS, were materially false and misleading and/or lacked a reasonable basis at all relevant times.  Among other things, the Individual Defendants concealed from investors that the Company's reported net income and EPS was a contrivance engineered to, absent extraordinary circumstances, avoid falling short of analysts' consensus EPS estimates.

c.      As a result, the Individual Defendants' statements about the Company's net income and EPS, including the reported quarterly results and the manner in which the Company calculated basic and diluted EPS, were materially false and misleading and/or lacked a reasonable basis at all relevant times.  Among other things, the Individual Defendants concealed from investors that the Company's reported net income and EPS was a contrivance engineered to, absent extraordinary circumstances, avoid falling short of analysts' consensus EPS estimates.

107.    The foregoing statements were false and misleading when made and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular, Defendants McCartney, Shea, Wahl, and McBryan knowingly or recklessly failed to disclose that, prior to the Relevant Period and at all times in FY 2014, the Company lacked sufficient internal controls to prevent the Company from manipulating

its net income and reporting EPS to artificially achieve EPS results that met or exceeded analysts' consensus EPS estimates.

**B.      FY 2015 False and Misleading Statements Sustained in the Securities Action**

108.    On April 14, 2015, the Company issues a press release announcing its quarterly results for the three months ended March 31, 2015 ("Q1 2015").  The Company reported that, "[n]et income for the three months ended March 31, 2015 was $15,516,000 or $0.22 per basic and diluted common share, compared to the three months ended March 31, 2014 net income of $14,639,000 or $0.21 per basic and per diluted common share."  The press release included Consolidated Statements of Income for Q1 2015, which also reported $0.22 basic and diluted EPS.  Defendant Shea signed the Form 8-K filed with the SEC to which the press release was attached.  The press release listed Defendants McCartney, Wahl, and McKee as "Company Contacts."

109.    On April 15, 2015, the Company held an earnings call to discuss its Q1 2015 earnings.  Defendants McCartney, McKee, and Wahl participated on behalf of the Company.  Defendant McKee noted that, "[n]et income for the quarter was $15.5 million or $0.22 per share compared to $14.6 million or $0.21 per share in the first quarter of 2014, both net income and earnings per share were new company records."

110.    On April 23, 2015, the Company filed its related quarterly report on Form 10-Q for Q1 2015 with the SEC ("Q1 2015 Form 10-Q").  Defendants McCartney and Shea signed the Q1 2015 Form 10-Q.  In Consolidated Statements of Comprehensive Income, the Company repeated the net income results and basic and diluted EPS results for Q1 2015 of $0.22.  The Q1 2015 Form 10-Q also noted, with respect to the Company's EPS computations, that, "[b]asic net earnings per share are computed using the weighted-average number of common shares outstanding.  The

dilutive effect of potential common shares outstanding is included in diluted net earnings per share."

111.    With respect to the Company's "Disclosure Controls and Procedures," HCSG noted that, "[b]ased on their evaluation as of March 31, 2015, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) (sec) are effective."

112.    The Q1 2015 Form 10-Q included a SOX Certification that was substantially the same as the SOX Certification alleged above in ¶90.

113.    On July 14, 2015, the Company issued a press release to announce its earnings for the three months ended June 30, 2015 ("Q2 2015").  The press release stated that, "[n]et income for the three months ended June 30, 2015 was $16,288,000 or $0.23 per basic and per diluted common share, compared to the three months ended June 30, 2014 net income of $13,921,000 or $0.20 per basic and per diluted common share."  The press release included Consolidated Statements of Income, which noted that basic and diluted earnings per common share in Q2 2015 amounted to $0.23.  Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release as an exhibit.  The press release listed Defendants McCartney, Wahl, and McKee as "Company Contacts."

114.    On July 15, 2015, the Company held an earnings call to discuss its Q2 2015 results, including its quarterly net income and EPS, which Defendant Wahl touted as "company records." Defendants McCartney, Wahl, and McKee participated on the call on behalf of the Company. Defendant McKee reported, "[n]et income for the quarter increased to $16.3 million or $0.23 per share, compared to $13.9 million or $0.20 per share in the second quarter of 2014.  Both net income and earnings per share were company records."  Defendant Wahl added, "I think in the near term,

we continue to plan for double-digit revenue growth for the balance of the year." Again touting the Company's historic performance, Defendant Wahl further noted that, "[t]he Q4 and Q1 expansion efforts do provide us with a good platform for the back half of the year to not only maintain our growth rate, but also the margin improvement that we've demonstrated during the first half of 2015."

115. On July 22, 2015, the Company filed its Q2 2015 quarterly results on Form 10-Q with the SEC ("Q2 2015 Form 10-Q"). Defendants Wahl and Shea signed the Q2 2015 Form 10-Q. The Company reiterated its previously reported net income and basic and diluted EPS amounting to $0.23. With respect to computing EPS, the Company reported, "[b]asic net earnings per share are computed using the weighted-average number of common shares outstanding. The dilutive effect of potential common shares outstanding is included in diluted net earnings per share."

116. With respect to the Company's "Disclosure Controls and Procedures," the Q2 2015 Form 10-Q noted, "[b]ased on their evaluation as of June 30, 2015, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) are effective."

117. The Q2 2015 Form 10-Q included a SOX Certification that was substantially the same as the SOX Certification alleged above in ¶90.

118. On October 13, 2015, the Company issued a press release to announce its quarterly results for the three months ended September 30, 2015 ("Q3 2015"). The Company reported that net income for the three months ended September 30, 2015 was $17,086,000 or $0.24 per basic and per diluted EPS. The press release also contained Consolidated Statements of Income

reporting that basic and diluted EPS amounted to $0.24 for Q3 2015.  Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release.

119.    On October 14, 2015, the Company held an earnings call to discuss its Q3 2015 results.  Defendant Wahl again touted the quarter's EPS results as a "company record."  Defendants McCartney, Wahl, and McKee participated on the call on behalf of the Company.   Defendant McKee noted that, "[n]et income for the quarter increased to $17.1 million or $0.24 per share." Defendant McKee explained in his introductory remarks that, "[b]oth net income and earnings per share for the quarter and year-to-date are company records."

120.    On October 23, 2015, the Company filed its Q3 2015 results on Form 10- with the SEC ("Q3 2015 Form 10-Q").  The Q3 2015 Form 10-Q included Consolidated Statements of Comprehensive Income that reiterated the previously reported net income for the quarter and reported basic and diluted earnings per common share of $0.24.  With respect to EPS computations, the 10-Q reported for EPS that, "[b]asic net earnings per share are computed using the weighted-average number of common shares outstanding.  The dilutive effect of potential common shares outstanding is included in diluted net earnings per share."  The Q3 2015 Form 10-Q further noted with respect to computations that, "[b]asic earnings (loss) per common share are computed by dividing income (loss) available to common shareholders by the weighted-average common shares outstanding for the period.  Diluted earnings (loss) per common share reflect the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options."

121.    With respect to the Company's "Disclosure Controls and Procedures," the Q3 2015 Form 10-Q noted that, "[b]ased on their evaluation as of September 30, 2015, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial

Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) are effective."

122.    The Q3 2015 Form 10-Q included a SOX Certification that was substantially the same as the SOX Certification alleged above in ¶90.

123.    On February 2, 2016, the Company issued a press release on Form 8-K announcing its results for the three quarters ended December 31, 2015 ("Q4 2015"), as well as for FY 2015. The Company reported that, "[i]nclusive of the previously announced settlement costs, net income for the three months ended December 31, 2015 was $9,134,000 or $0.13 per basic and per diluted common share."   The press release contained Consolidated Statements of Income, which reiterated, for the three months ended December 31, 2015, net income of $9,134,000 and basic and diluted EPS of $0.13.  Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release.  The press release listed Defendants McCartney, Wahl, and McKee as "Company Contacts."

124.    On February 3, 2016, the Company held an earnings call to discuss its Q4 2015 and FY 2015 results.  Defendants McCartney, Wahl, and McKee participated on the call.  Defendant McKee reported that, "[i]ncluding settlement-related costs, net income was $9.1 million or $0.13 per share for the quarter and $58 million or $0.80 per share for the year."

125.    On February 19, 2016, the Company filed its Annual Report for FY 2015 on Form 10-K with the SEC ("2015 Form 10-K").  Therein, the Company reiterated that, for Q4 2015, net income was $9,134,000 and that basic and diluted EPS was $0.13.   With respect to EPS computations, the Company noted that, "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average common shares outstanding for the period.  Diluted earnings per common share reflect the weighted-average

common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options."  Defendants Wahl, Shea, McCartney, and McBryan signed the 2015 Form 10-K.

126.    With respect to "Disclosure Controls and Procedures," the 2015 Form 10-K noted that, "[i]n accordance with Exchange Act Rules 13a-15 and 15a-15, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report."

127.    The 2015 Form 10-K included a SOX Certification that was substantially the same as the SOX Certification alleged above in ¶90.

128.    The foregoing statements were false and misleading when made and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular:

a.    Starting prior to the Relevant Period and continuing throughout FY 2015, the Individual Defendants made the Company falsely appear to meet or beat analysts' targets for quarterly EPS consistently.  The Individual Defendants overstated the Company's quarterly EPS by continually manipulating net income to generate EPS results that would have a third digit (representing tenths of a cent) that would permit the rounding up of reported EPS to artificially avoid falling short of analysts' consensus EPS target for the Company.  The Individual Defendants therefore knowingly or recklessly overstated the Company's EPS to meet analyst estimates and falsely perpetuated the Company's reputation for stable and consistent financial performance.

b.    As a result, the Individual Defendants' statements about the Company's net income and EPS, including the reported quarterly results and the manner in which the Company calculated basic and diluted EPS, were materially false and misleading and/or lacked a reasonable

basis at all relevant times.   Among other things, the Individual Defendants concealed from investors that the Company's reported net income and EPS was a contrivance engineered to, absent extraordinary circumstances, avoid falling short of analyst's consensus EPS estimates.

c.     As a result, the Company's financial statements and results for the quarter materially overstated or otherwise misrepresented the Company's EPS.

129.   The foregoing statements were false and misleading when made and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.   In particular, Defendants McCartney, Shea, Wahl, and McBryan knowingly or recklessly failed to disclose that, prior to the Relevant Period and at all times in FY 2015, the Company lacked sufficient internal controls to prevent their Company from manipulating its net income and reporting EPS to artificially achieve EPS results that met or exceeded analysts' consensus EPS estimates.

**C.     FY 2016 False and Misleading Statements Sustained in the Securities Action**

130.   On April 12, 2016, the Company issued a press release to announce its quarterly results for the three months ended March 31, 2016 ("Q1 2016").   The press release announced that, "[n]et income for the three months ended March 31, 2016 was $18,626,000 or $0.26 per basic and per diluted common share, compared to the three months ended March 31, 2015 net income of $15,516,000 or $0.22 per basic and per diluted common share."   The press release also contained Consolidated Statements of Income, which noted that basic and diluted earnings per common share were $0.26 for Q1 2016.   Defendant Shea signed the Form 8-K to which the press release was attached.   The press release listed Defendants McCartney, Wahl, and McKee as "Company Contacts."

131.    On April 13, 2016, the Company hosted an earnings call to discuss its results for Q1 2016.  During the call, Defendant McKee again stressed that the Company's net income and EPS were records for the quarter.  Defendants McCartney, Wahl, and McKee participated on behalf of the Company.  McKee stated, "net income for the quarter increased to $18.6 million or $0.26 per share, compared to $15.5 million or $0.22 per share in Q1 of 2015.  Both net income and earnings per share were company records for the quarter."

132.    On April 22, 2016, the Company filed its quarterly report on Form 10-Q for Q1 2016 with the SEC ("Q1 2016 Form 10-Q").  Defendants Wahl and Shea signed the Q1 2016 Form 10-Q.  With respect to EPS, the Company reiterated its previously reported net income for Q1 2016 and reported earnings per basic and per diluted common share of $0.26.  With respect to how the Company calculated its EPS, the Q1 2016 Form 10Q noted that, "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share are calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options."  The Q1 2016 Form 10-Q further noted that, "[b]asic earnings per share are computed using the weighted-average number of common shares outstanding.  The dilutive effect of potential common shares outstanding is included in diluted earnings per share."

133.    With respect to internal controls, the Q1 2016 Form 10-Q noted that, "[b]ased on their evaluation as of March 31, 2016, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e) are effective."

134.    The Q1 2016 Form 10-Q included a SOX Certification that was substantially the same as the SOX Certification alleged in ¶90.

135.    On July 12, 2016, the Company issued a press release to announce its quarterly results for the three months ended June 30, 2016 ("Q2 2016").  The press release reported, "[n]et income for the three months ended June 30, 2016 was $18,760,000 or $0.26 per basic and per diluted common share, compared to the three months ended June 30, 2016 net income of $16,288,000 or $0.23 per basic and per diluted common share."  The press release included Consolidated Statements of Income, which reiterated that per basic and per diluted EPS were $0.26 for Q2 2016.  Defendant Shea signed the Form 8-K to which the press release was attached.  The press release listed Defendants McCartney, Wahl, and McKee as "Company Contacts."

136.    On July 13, 2016, the Company held an earnings call to discuss its results for Q2 2016.  Defendants Wahl and McKee participated on behalf of the Company.  Defendant McKee again touted the EPS results as a company record.  During the call, Defendant McKee stated that, "[n]et income for the quarter increased to $18.7 million or $0.26 per share, and that compares to $16.2 million or $0.23 per share in the second quarter of 2015.  Both net income and earnings per share were company records."

137.    On July 22, 2016, the Company filed its quarterly results for Q2 2016 on Form 10-Q with the SEC ("Q2 2016 Form 10-Q").  Defendants Wahl and Shea signed the Q2 2016 Form 10-Q.  The Q2 2016 Form 10-Q contained Consolidated Statements of Comprehensive Income which reiterated the Company's previously reported net income and reported that earnings per basic and per diluted common share were $0.26.  With respect to EPS calculations, the Q2 2016 Form 10-Q noted that, "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding

for the period.  Diluted earnings per common share are calculated using the weighted-average number of common share outstanding and dilutive common shares, such as those issuable upon exercise of stock options."  The Q2 2016 Form 10-Q also noted with respect to EPS computation that, "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively.  The weighted-average number of diluted common shares includes the impact of dilutive securities, including unvested, unexercised stock options and unvested restricted stock."

138.    With respect to internal controls, the Q2 Form 10-Q noted that, "[b]ased on their evaluation as of June 30, 2016, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

139.    The Q2 2016 Form 10-Q included a SOX Certification that was substantially the same as the SOX Certification alleged in ¶90.

140.    On October 11, 2016, the Company issued a press release to announce its results for the three months ended September 30, 2016 ("Q3 2016").  The Company reported that the, "[n]et income for the three months ended September 30, 2016 was $19,711,000 or $0.27 per basic and per diluted common share, compared to the three months ended September 30, 2016 net income of $17,086,000 or $0.24 per basic and per diluted common share."  The press release included Consolidated Statements of Income, which noted that basic and diluted earnings per common share totaled $0.27 for Q3 2016.  Defendant Shea signed the Form 8-K filed with the SEC to which the press release was attached.  The press release listed Defendants McCartney, Wahl, and McKee as "Company Contacts."

141.     On October 12, 2016, the Company held an earnings call to discuss its quarterly results for Q3 2016.   Defendants Wahl and McKee participated on behalf of the Company. Defendant McKee again emphasized that the EPS results were a company record, noting that, "[n]et income for the quarter increased to $19.7 million or $0.27 per share and that compare[d] to $17.1 million or $0.24 per share for the third quarter of 2015.  Both net income and earnings per share were company records."

142.     On October 28, 2016, the Company issued its quarterly report on Form 10-Q for Q3 2016 with the SEC ("Q3 2016 Form 10-Q").  Defendants Wahl and Shea signed the Q3 2016 Form 10-Q.  The Q3 2016 Form 10-Q contained Consolidated Statements of Comprehensive Income, which reiterated the previously reported net income for Q3 2016 and noted that basic and diluted earnings per common share were $0.27.  With respect to how the Company calculated its reported EPS, the Q3 2016 Form 10-Q noted that, "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share are calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options."  The Q3 2016 Form 10-Q further noted that, "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively.  The weighted-average number of diluted common shares includes the impact of dilutive securities, including unvested, unexercised stock options and unvested restricted stock."

143.     With respect to internal controls and procedures, the Q3 2016 Form 10-Q noted that, "[b]ased on their evaluation as of September 30, 2106, pursuant to Exchange Act Rule 13a-

15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

144.    The Q3 2016 Form 10-Q included a SOX Certification that was substantially the same as the SOX Certification alleged in ¶90.

145.    On February7, 2017, the Company issued a press release to announce its results for the three months ended December 31, 2016 ("Q4 2016") and FY 2016.  In its press release, the Company reported, "[n]et income for the three months ended December 31, 2016 was $20.3 million, or $0.28 per basic and diluted common share."  The press release contained Consolidated Statements of Income, which noted that basic and diluted earnings per common share were $0.28 for Q4 2016.  Defendant Shea signed the Form 8-K filed with the SEC to which the press release was attached.  The press release listed Defendants McCartney, Wahl, and McKee as "Company Contacts."

146.    On February 8, 2017, the Company held an earnings call to discuss its Q4 2016 and FY 2016 results.  Defendants Wahl and McKee participated on behalf of the Company.  Defendant McKee again touted the Company's EPS results as a record.  During the call, McKee noted that, "net income for the quarter increased to $20.3 million or $0.28 per share, and for the year it was $77.4 million or $1.05 per share.  Both net income and earnings per share for the quarter and year were company records."

147.    On February 24, 2017, the Company filed its Annual Report FY 2016 on Form 10-K with the SEC ("2016 Form 10-K").  Defendants Wahl, Shea, McCartney, and McBryan signed the 2016 Form 10-K.  The 2016 Form 10-K reiterated the previously reported net income for Q4 2016 and basic and diluted earnings per common share amounted to $0.28.  With respect to how the Company calculated its EPS, the 2016 Form 10-K stated that, "[b]asic earnings per common

share are computed by dividing income available to common shareholders by the weighted-average common shares outstanding for the period.  Diluted earnings per common share reflect the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock."

149.    With respect to internal controls, the 2016 Form 10-K stated that, "[i]n accordance with Exchange Act Rules 13a-15 and 15a-15, we carried out an evaluation, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this report.  Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of December 31, 2016."

149.    The 2016 Form 10-K included a SOX Certification that was substantially the same as the SOX Certification alleged in ¶90.

150.    The foregoing statements were false and misleading when made and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular:

a.    Starting prior to the Relevant Period and continuing throughout FY 2016, the Individual Defendants made the Company falsely appear to meet or beat analysts' targets for quarterly EPS consistently.  The Individual Defendants overstated the Company's quarterly EPS by continually manipulating net income to generate EPS results that would have a third digit (representing tenths of a cent) that would permit the rounding up of reported EPS to artificially avoid falling short of analysts' consensus EPS targets for the Company.  The Individual Defendants therefore knowingly or recklessly overstated the Company's EPS to meet analyst

estimates and falsely perpetuate the Company's reputation for stable and consistent financial performance.

b.    As a result, the Individual Defendants' statements about the Company's net income and EPS, including the reported quarterly results and the manner in which the Company calculated basic and diluted EPS, were materially false and misleading and/or lacked a reasonable basis at all relevant times.   Among other things, the Individual Defendants concealed from investors that the Company's reported EPS was a contrivance engineered to, absent extraordinary circumstances, avoid falling short of analysts' consensus EPS estimates.

c.    As a result, the Company's financial statements and results for the quarter materially overstated or otherwise misrepresented the Company's EPS.

151.    The foregoing statements were false and misleading when made and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.   In particular, Defendants McCartney, Shea, Wahl, and McBryan knowingly or recklessly failed to disclose that, prior to the Relevant Period and at all times in FY 2016, the Company lacked sufficient internal controls to prevent the Company from manipulating its net income and reporting EPS to artificially achieve EPS results that met or exceeded analysts' consensus EPS estimates.

**D.    FY 2017 False and Misleading Statements Sustained in the Securities Action**

152.    On April 12, 2017, the Company issued a press release to announce its quarterly results for the three months ended March 31, 2017 ("Q1 2017").   The Company reported that, "[n]et income for the three months ended March 31, 2017 was $22.0 million, or $0.30 per basic and diluted common share, compared to the three months ended March 31, 2016 net income of $18.6 million, or $0.26 per basic and diluted common share."   Defendant Shea signed the Form 8-

K filed with the SEC to which the press release was attached.  The press release listed Defendants McCartney, Wahl, and McKee as "Company Contacts."

153.    On April 12, 2017, the Company held an earnings call to discuss its Q1 2017 results. Defendants Wahl and McKee participated on behalf of the Company.  This was the first quarterly earnings call after publication of the Monocle Report.  Defendant McKee touted the quarter's results as Company records, stating that, "[n]et income for the quarter increased to $22 million or $0.30 per share, and both net income and earnings per share for the quarter were company records."

154.    During the question-and-answer portion of the call, Andrew Wittmann, a securities analyst from Robert W. Baird, asked Defendant Wahl for comments on reports that HCSG rounded up its quarterly results.  The analyst asked, "[m]y last question here is just on some of the reports that came out about the company quarterly results being rounded up for a long period of time on the quarter.  The annual results clearly don't round up, but I think just given that this has gotten some attention, it'd be worth having you guys comment on that and just give us your thoughts on that."  In response, Defendant Wahl dismissed the question and downplayed the significance of the rounding issue.  Wahl stated, "I can tell you – *without knowing what article or more specifically what iteration of articles you're referring to*, I can tell you we believe our best efforts are spent actually running the company and delivering outcomes for our customers, our employees and all of our shareholders, not the latest and greatest investor sentiment with third-party articles and blogs."  Wahl added, "*[a]nd when you look at over the past 10 or so years that you mentioned, our track record really speaks for itself*.  We've tripled the size of the company, customers, employees, revenues, profits.  We've paid out more than $400 million in dividends during that timeframe.  And most importantly, we position the company today to surpass that performance

and deliver for all of our stakeholders over the next decade. ***So again, I think our track record of performance over the past 10 years really stands on its own***."

155.    On April 28, 2017, HCSG filed its quarterly report for Q1 2017 with the SEC on Form 10-Q ("Q1 2017 Form 10-Q").  Defendants Wahl and Shea signed the Q1 2017 Form 10-Q. The Q1 2017 Form 10-Q reiterated the Company's previously reported net income and reported $0.30 basic and diluted earnings per common share for Q1 2017.  With respect to how the Company calculated its EPS results, the Q1 2017 Form 10-Q stated, "[b]asic earnings per common share are computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share are calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units."  The Q1 2017 Form 10-Q also stated, "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively.  The weighted-average number of diluted common shares includes the impact of dilutive securities, including unvested, unexercised stock options and unvested restricted stock and restricted stock units."

156.    With respect to "Disclosure Controls and Procedures," the Q1 2017 Form 10-Q stated, "[b]ased on their evaluation as of March 31, 2017, pursuant to Exchange Act Rule 13a-15(b), our management, including our Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

157.    The Q1 2017 Form 10-Q included a SOX Certification that was substantially the same as the SOX Certification alleged in ¶90.

158.    On July 11, 2017, the Company issued a press release to announce its quarterly results for the three months ended June 30, 2017 ("Q2 2017").  The press release stated, "[n]et income for the three months ended June 30, 2017 was $22.6 million, or $0.31 per basic and $0.30 per diluted common share, compared to the three months ended June 30, 2016 net income of $18.8 million, or $0.26 per basic and diluted common share."  The press release included Consolidated Statements of Income, which also reported net income of $22,551,000 and basic EPS of $0.31 and diluted EPS of $0.30.  Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release.  The press release listed Defendants Wahl and McKee as "Company Contacts."

159.    The following day, on July 12, 2017, the Company hosted an earnings call to discuss its Q2 2017 results.  On behalf of the Company, Defendants Wahl and McKee participated on the call.  Defendant McKee echoed the Company's earnings results for the quarter, including that "[n]et income for the quarter increased to $22.6 million or $0.30 per share."

160.    On July 28, 2017, the Company filed its quarterly report on Form 10-Q for Q2 2017 with the SEC (the "Q2 2017 Form 10-Q").  Defendants Wahl and Shea signed the Q2 2017 Form 10-Q.  The Q2 2017 Form 10-Q contained Consolidated Statements of Comprehensive Income, which reiterated the Company's previously reported net income of $22.6 million and basic EPS of $0.31 and diluted EPS of $0.30.  With respect to EPS calculations, the Q2 2017 Form 10-Q stated, "[b]asic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share is calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units."  Moreover, the Q2 2017 Form 10-Q stated, "[b]asic and diluted earnings per common share are computed by dividing net

income by the weighted-average number of basic and diluted common shares outstanding, respectively. The weighted-average number of diluted common shares includes the impact of dilutive securities, including outstanding stock options and unvested restricted stock and restricted stock units."

161.    With respect to "Disclosure Controls and Procedures," the Q2 2017 Form 10-Q stated that, "[b]ased on their evaluation as of June 30, 2017, pursuant to Exchange Act Rule 13a-15(b), our management, including our President and Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

162.    The Q2 2017 Form 10-Q contained a SOX Certification that was substantially the same as the SOX Certification alleged above in ¶90.

163.    On October 17, 2017, the Company issued a press release to announce its quarterly results for the three months ended September 30, 2017 ("Q3 2017"). The press release stated, "[n]et income for the three months ended September 30, 2017 was $23.5 million, or $0.32 per basic common share and $0.31 per diluted common share, compared to the three months ended September 30, 2016 net income of $19.7 million, or $0.27 per basic and diluted common share." The press release included Consolidated Statements of Income, which reported, for Q3 2017, a net income of $23,472,000 and basic EPS of $0.32 and diluted EPS of $0.31. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release. The press release listed Defendants Wahl and McKee as "Company Contacts."

164.    The following day, on October 18, 2017, the Company hosted an earnings call to discuss the Company's Q3 2017 results. On behalf of the Company, Defendants Wahl and McKee participated on the call. Defendant McKee again touted the EPS results as a company record,

stating, "[n]et income for the quarter increased to $23.5 million or $0.31 per share, both net income and earnings per share for the quarter were company records."

165.    Weeks later, on October 27, 2017, the Company filed its quarterly report on Form 10-Q for Q3 2017 with the SEC ("Q3 2017 Form 10-Q").  Defendants Wahl and Shea signed Q3 2017 Form 10-Q.  With respect to EPS, HCSG reiterated its previously reported net income of $23,472,000 for Q3 2017, and reported basic EPS of $0.32 and diluted EPS of $0.31.  With respect to EPS computing, the Q3 2017 Form 10-Q stated, "[b]asic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share is calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units."

166.    With respect to "Disclosure Controls and Procedures," the Q3 2017 Form 10-Q stated, "[b]ased on their evaluation as of September 30, 2017, pursuant to Exchange Act Rule 13a-15(b), our Management, including our President and Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

167.    The Q3 2017 Form 10-Q included a SOX Certification that was substantially the same as the SOX Certification alleged above in ¶90.

168.    On February 6, 2018, the Company issued a press release to announce its quarterly results for the three months ended December 31, 2017 ("Q4 2017") and FY 2017.  The press release stated, "[n]et income for the three months ended December 31, 2017 was $20.2 million or $.027 per basic and diluted common share."  The press release included Consolidated Statements

of Income, which reported, for Q4 2017, a net income of $20,186,000 and basic and diluted EPS of $0.27.  Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release.  The press release listed Defendants Wahl and McKee as "Company Contacts."

169.    On February 7, 2018, the Company hosted an earnings call to discuss its Q4 2017 and FY 2017 results.  On behalf of the Company, Defendants Wahl and McKee participated on the call.  Defendant McKee stated, "[n]et income came in at $20 million or $0.27 per share for the quarter, and $88 million or $1.19 per share for the year."

170.    On February 23, 2018, the Company filed its Annual Report for FY 2017 on Form 10-K with the SEC (the "2017 Form 10-K").  Defendants Wahl and Shea signed the 2017 Form 10-K.  With respect to quarterly net income and EPS, the Company reiterated its previously reported net income of $20,186,000 for Q4 2017 and basic and diluted EPS of $0.27.  With respect to how the Company calculated its EPS, HCSG stated, "[b]asic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share is calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units."  HCSG further stated that, "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively.  The weighted-average number of diluted common shares includes the impact of dilutive securities, including outstanding stock options and unvested restricted stock and restricted stock units."

171.    With respect to "Disclosure Controls and Procedures," the 2017 Form 10-K stated that, "[i]n accordance with Securities Exchange Act Rules 13a-15 and 15a-15, the Company

carried out an evaluation, under the supervision and with the participation of management, including the Company's Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Company's disclosure controls and procedures as of the end of the period covered by this report.  Based on that evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of December 31, 2017."

172.    The 2017 Form 10-K included a SOX Certification that was substantially the same as the SOX Certification alleged above in ¶90.

173.    The 2017 Form 10-K also contained additional misstatements and material omissions as a consequence of the Company's failure to disclose the existence of the SEC's investigation into the Company's EPS practices.  The 2017 Form 10-K omitted to disclose any information about the SEC's investigation of the company's EPS practices, which had been proceeding since approximately November 2017.

174.    The 2017 Form 10-K contained further material omissions regarding the SEC's investigation into the Company's EPS practices.  The 2017 Form 10-K stated, in its Item 1A Risk Disclosures:

> ***Failure to maintain effective internal control over financial reporting could have a material adverse effect on our ability to report our financial results on a timely and accurate basis***.
>
> Failure to maintain appropriate and effective internal controls over our financial reporting could result in misstatements in our financial statements and potentially subject us to sanctions or investigations by the SEC or other regulatory authorities, and could cause us to delay the filing of required reports with the SEC and our reporting of financial results.  Any of these events could result in a decline in the market price of our Common Stock.  Although we have taken steps to maintain our internal control structure as required, we cannot guarantee that control deficiencies will not result in a misstatement in the future.
>
> (Emphasis in original.)

175.    The foregoing statements were false and misleading when made and omitted the statement of material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular:

a.    Starting prior to the Relevant Period and continuing throughout the first three quarters of FY 2017, the Individual Defendants made the Company falsely appear to meet or beat analysts' targets for quarterly EPS consistently.  The Individual Defendants overstated the Company's quarterly EPS by continually manipulating net income to generate EPS results that would have a third digit (representing tenths of a cent) that would permit the rounding up of reported EPS to artificially avoid falling short of analysts' consensus EPS target for the Company. The Individual Defendants therefore knowingly or recklessly overstated the Company's EPS in the first three quarters of FY 2017 to avoid falling short of analysts' EPS estimates and falsely perpetuate the Company's reputation for stable and consistent financial performance.

b.    In Q4 2017, a quarter in which the Company reported net income and EPS that missed analysts' consensus EPS estimate for the first time in eight quarters, the Company failed to disclose that the SEC had contacted HCSG in November 2017 as part of an investigation into the Company's EPS practices.  The Individual Defendants knew or were reckless in not knowing that the SEC's investigation into the Company's EPS practices was a material issue for shareholders in approximately March or April 2017 due to: (i) Monocle's outreach to Defendants McCartney, Wahl, and McKee prior to the March 23, 2017 publication of the Monocle Report; and/or (ii) Defendant Wahl's April 12, 2017 response to an analyst question about the subject of the Monocle Report.

c.    As a result, the Individual Defendants' statements about the Company's net income and EPS in the first three quarters of 2017, including the reported quarterly results and the

manner in which the Company calculated basic and diluted EPS, were materially false and misleading and/or lacked a reasonable basis at all relevant times.  Among other things, the Individual Defendants concealed from shareholders that the Company's reported EPS was a contrivance engineered to, absent extraordinary circumstances, avoid falling short of analysts' consensus EPS estimates.

> d.   As a result, the Company's financial statements and results for each quarter materially overstated for the first three quarters of 2017, or otherwise failed to disclose that the Company's EPS, in Q4 2017, was the subject of an SEC investigation.

176.   The statements made by Defendant Wahl in response to an analyst's question about the substance of the Monocle Report in ¶154 were materially false and misleading because Monocle had informed Defendant Wahl of the Monocle Report's conclusions before publication of the Monocle Report.  Moreover, as alleged in ¶154 herein, Defendant Wahl's responses to analyst Wittmann reveal that Wahl, in fact, knew about the Monocle Report and its conclusions about the Company's EPS practices.  Additionally, Defendant Wahl's response was false and misleading because it concealed that the analysis and conclusions in the Monocle Report were true and accurate.

177.   The foregoing statements were false and misleading when made and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular, Defendants Wahl and Shea knowingly or recklessly failed to disclose that, prior to the Relevant Period and at all times in FY 2017, the Company lacked sufficient internal controls to prevent the Company from manipulating its net income and reporting EPS to artificially achieve EPS results that met or exceeded analysts' consensus EPS estimates.

178.    The statements made in ¶¶168-69 regarding the Company's Q4 2017 EPS results and practices were also materially false and misleading because they omitted to disclose the fact that the Company was the subject of an ongoing SEC examination into the Company's EPS rounding and reporting practices.

179.    The statements made in the 2017 Form 10-K Item 1A risk disclosure (*see* ¶174), regarding generalized risks of an SEC investigation, omitted to disclose the material fact that, in November 2017, the Company learned that it was the subject of an SEC inquiry into the Company's EPS practices.  The EPS practices that were the subject of the SEC's investigation were known to the Individual Defendants to be a material issue for shareholders in approximately March or April 2017 due to: (i) Monocle's outreach to Defendants McCartney, Wahl, and McKee prior to the march 23, 2017 publication of the Monocle Report; (ii) Defendant Wahl's April 12, 2017 response to an analyst question about the subject of the Monocle Report; and/or (iii) the Individual Defendants' concession that the ongoing investigation could have a "substantial" impact on the Company's expenses and financial results.

**E.    FY 2018 False and Misleading Statements Sustained in the Securities Action**

180.    In April 2018, the Company announced results and revealed information showing that it missed analysts' consensus EPS estimates.

181.    On April 17, 2018, the Company issued a press release to announce its quarterly results for the three months ended March 31, 2018 ("Q1 2018").  The press release stated, "[n]et income for the three months ended March 31, 2018 was $0.1 million, or $0.00 per basic and diluted common share."  Purporting to explain these results, the press release added: "[t]he decline from the prior three month period ended March 31, 2017 related to the Company's first quarter 2108 increase in its accounts receivable allowance, primarily related to corporate restructurings of two

privately-held, multi-state operations, as discussed in the Company's press releases on April 16, 2018." The press release included Consolidated Statements of Income, which also reported, for Q1 2018, net income of $72,000 and basic and diluted EPS of $0.00. Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release. The press release listed Defendants Wahl and McKee as "Company Contacts."

182.   The following day, on April 18, 2018, the Company hosted an earnings call to discuss its Q1 2018 results. Defendants Wahl and McKee participated on behalf of the Company. Defendant McKee stated that, "[n]et income for the quarter was around $72,000, but after adjusting for that $35 million reserve that [Defendant Wahl] addressed in his opening comments, earnings per share would have been around $0.35 per share."

183.   On April 27, 2018, the Company filed its quarterly report on Form 10-Q for Q1 2018 with the SEC (the "Q1 2018 Form 10-Q"). Defendants Wahl and Shea signed the Q1 2018 Form 10-Q. With respect to EPS, the Company reported net income of $72,000 for Q1 2018 and reported earnings per basic and per diluted common share of $0.00. With respect to how the Company calculated EPS, HCSG stated, "[b]asic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period  Diluted earnings per common share is calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units." HCSG further stated, "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively. The weighted-average number of diluted common shares includes the

impact of dilutive securities, including outstanding stock options and unvested restricted stock and restricted stock units."

184.    With respect to "Disclosure Controls and Procedures," the Q1 2018 Form 10-Q stated that, "[b]ased on their evaluation as of March 31, 2018, pursuant to Exchange Act Rule 13a-15(b), our Management, including our President and Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

185.    The Q1 2018 Form 10-Q also contained misstatements about the SEC's inquiry. The Q1 2018 Form 10-Q stated, "[t]he Company is subject to various claims and legal actions in the ordinary course of business.  Some of these matters include payroll and employee-related matters and examinations by government agencies."  The Q1 2018 Form 10-Q added, "[i]f adverse outcomes of such claims and legal actions are reasonably possible, Management assesses materiality and provides financial disclosure, as appropriate."  The Q1 2018 Form 10-Q continued, "[t]he Company believes it is not a party to, nor are any of its properties the subject of, any pending legal proceeding or governmental examination that would have a material adverse effect on the Company's consolidated financial condition or liquidity."

186.    The Q1 2018 Form 10-Q omitted to disclose material information about the SEC's investigation.  The Q1 2018 Form 10-Q reaffirmed its Item 1A risk disclosures from the 2017 Form 10-K, including with respect to SEC investigations (*see supra* ¶174) and stated: "There have been no material changes in the risk factors set forth in Part I, Item 1A, 'Risk Factors' in the Company's Annual Report on Form 10-K for the year ended December 31, 2017."

187.    In July 2018, HCSG announced results showing that it again missed EPS analyst estimates.  On July 17, 2018, the Company issued a press release to announce its quarterly results

for the three months ended June 30, 2018 ("Q2 2018").  The press release stated, "[n]et income for the three months ended June 30, 2018 was $25.8 million, or $0.35 per basic and diluted common share."  The press release included Consolidated Statements of Income, which also reported, for Q2 2018, net income of $25,814,000 and basic and diluted EPS of $0.35.  Defendant Shea signed the Form 8-K filed with the SEC, which attached the press release.  The press release listed Defendants Wahl and McKee as "Company Contacts."

188.   On July 18, 2018, the Company hosted an earnings call to discuss its Q2 2018 results.  Defendants Wahl and McKee participated on behalf of the Company.  Defendant McKee stated, "[n]et income for the quarter was $25.8 million, and earnings per share came in at $0.35 per share."

189.   On July 27, 2018, the Company filed its quarterly report on Form 10-Q for Q2 2018 with the SEC ("Q2 2018 Form 10-Q").  Defendants Wahl and Shea signed the Q2 2018 Form 10-Q.  With respect to EPS, the Company reiterated its previously reported net income of $25,814,000 for Q2 2018 and reported basic and diluted EPS of $0.35.  With respect to how the Company calculated its EPS, the Q2 2018 Form 10-Q stated, "[b]asic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.  Diluted earnings per common share is calculated using the weighted-average common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units."  The Q2 2018 Form 10-Q further stated, "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively.  The weighted-average number of diluted common

shares includes the impact of dilutive securities, including outstanding stock options and unvested restricted stock and restricted stock units."

190.    With respect to "Disclosure Controls and Procedures," the Q2 2018 Form 10-Q stated, "[b]ased on their evaluation as of June 30, 2018, pursuant to Exchange Act Rule 13a-15(b), our Management, including our President and Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

191.    The Q2 2018 Form 10-Q included a SOX Certification that was substantially the same as the SOX Certification alleged above in ¶90.

192.    The Q2 2018 Form 10-Q also omitted to disclose material information about the SEC's investigation.  The Q2 2018 Form 10-Q reaffirmed the Item 1A risk disclosures from the 2017 Form 10-K, including with respect to SEC investigations (*see supra* ¶174) and stated: "There have been no material changes in the risk factors set forth in Part I, Item 1A, 'Risk Factors' in the Company's Annual Report on Form 10-K for the year ended December 31, 2017."

193.    In October 2018, the Company announced results for the three months ended September 30, 2018 ("Q3 2018") revealing that the Company had again missed analysts' consensus EPS estimates.  On October 16, 2018, the Company issued an earnings release (the "Q3 2018 Earnings Release") that reported, "[f]or the three months ended September 30, 2018, net income was $26.1 million, or $0.35 per basic and diluted common share, segment margins in housekeeping & laundry and dining & nutrition services are estimated at 11.3% and 6.2%, respectively and cash flow from operations was $47 million, inclusive of the $25 million change in accrued payroll."

194.    The Q3 2018 Earnings Release included Consolidated Statements of Income, which also reported, for Q3 2018, net income of $26,086,000 and basic and diluted EPS of $0.35. Defendant Shea signed the Form 8-K filed with the SEC, to which a copy of the Q3 2018 Earnings Release was attached.   The Q3 2018 Earnings Release listed Defendants Wahl and McKee as "Company Contacts."

195.    The following day, on October 17, 2018, the Company hosted an earnings call to discuss its Q3 2018 results.   Defendants Wahl and McKee participated on the call on behalf of the Company.   Defendant McKee stated, "[n]et income for the quarter was $26.1 million, and earnings per share came in at $0.35 per share."

196.    On October 19, 2018, the Company filed its quarterly report for Q3 2018 on Form 10-Q with the SEC ("Q3 2018 Form 10-Q").   Defendants Wahl and Shea signed the Q3 2018 Form 10-Q.   With respect to EPS, the Company reported for Q3 2018 net income of $26,086,000 and reported basic and diluted EPS of $0.35.   With respect to how the Company calculated its EPS, the Q3 2018 Form 10-Q stated, "[b]asic earnings per common share is computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period.   Diluted earnings per common share is calculated using the weighted-average number of common shares outstanding and dilutive common shares, such as those issuable upon exercise of stock options and upon the vesting of restricted stock and restricted stock units." The Q3 2018 Form 10-Q further stated, "[b]asic and diluted earnings per common share are computed by dividing net income by the weighted-average number of basic and diluted common shares outstanding, respectively.   The weighted-average number of diluted common shares includes the impact of dilutive securities, including outstanding stock options and unvested restricted stock and restricted stock units."

197.    With respect to "Disclosure Controls and Procedures," the Q3 2018 Form 10-Q stated, "[b]ased on their evaluation as of September 30, 2018, pursuant to Exchange Act Rule 13a-15(b), our Management, including our President and Chief Executive Officer and Chief Financial Officer, believe our disclosure controls and procedures (as defined in Exchange Act 13a-15(e)) are effective."

198.    The Q3 2018 Form 10-Q included a SOX Certification that was substantially the same as the SOX Certification alleged above in ¶90.

199.    The Q3 2018 Form 10-Q omitted to disclose material information about the SEC's investigation.  The Q3 2018 Form 10-Q reaffirmed the Item 1A risk disclosures from the 2017 Form 10-K, including with respect to SEC investigations (*see supra* ¶174) and stated: "There have been no material changes in the risk factors set forth in Part I, Item 1A, 'Risk Factors' in the Company's Annual Report on Form 10-K for the year ended December 31, 2017."

200.    On February 5, 2019, the Company issued a press release to announce its quarterly results for the three months ended December 31, 2018 ("Q4 2018") as well as for FY 2018 (the "Q4 2018 Earnings Release").  The press release stated, "[n]et income for the quarter was $32 million, or $0.43 per basic and $0.42 per diluted common share, and segment margins in housekeeping & laundry and dining & nutrition services are estimated at 9.5% and 5.4%, respectively."  The press release included Consolidated Statements of Income, which also reported, for the three months ended December 31, 2018, net income of $31,552,000 and basic EPS of $0.43 and diluted EPS of $0.42.  Defendant Shea signed the Form 8-K filed with the SEC, which accompanied the press release.  The press release listed Defendants Wahl and McKee as "company Contacts."

201.     On February 6, 2019, the Company hosted an earnings call to discuss its Q4 2018 results.  Defendants Wahl and McKee participated on behalf of the Company.  Defendant McKee stated, "[n]et income for the quarter came in at $32 million, and earnings per share was $0.42 per share."

202.     The foregoing statements were false and misleading when made and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts, including:

a.     That the Company was the subject of an SEC inquiry as early as November 2017 in connection with an investigation of the Company's EPS practices, which the Individual Defendants knew or were reckless in not knowing was a material issue for investors in approximately March or April 2017 due to: (a) Monocle's outreach to Defendants McCartney, Wahl, and McKee prior to the March 23, 2017 publication of the Monocle Report; and/or (b) Defendant Wahl's April 12, 2017 response to an analyst question about the subject of the Monocle Report.

b.     That within months, and no later than March 2018, the SEC escalated its matter under inquiry into a "formal order of investigation" and served a formal subpoena on the Company.

c.     That as a result, the Individual Defendants' statements about the Company's EPS, including the reported quarterly results and the manner in which the Company calculated basic and diluted EPS, were materially false and misleading and/or lacked a reasonable basis at all relevant times.  Among other things, the Individual Defendants concealed from investors that the Company's EPS practices were the subject of an ongoing SEC investigation.

d.      As a result, the Company's financial statements and results for the quarter materially misrepresented the Company's reported quarterly EPS; and

e.      That ongoing investigations had generated significant expenses and could have a "substantial" impact on the Company's expenses and financial results.

203.    The foregoing statements with respect to internal controls were false and misleading when made and omitted to state material facts necessary to make the statements not misleading, because the statements failed to disclose adverse facts.  In particular, Defendants Wahl and Shea knowingly or recklessly failed to disclose that, prior to the Relevant Period and at all times in FY 2018, the Company lacked sufficient internal controls to prevent the Company from manipulating its net income and reporting EPS to artificially achieve EPS results that met or exceeded analysts' consensus EPS estimates.  The statements concerning the adequacy of internal controls were also materially false and misleading and omitted to disclose material information given that the statements failed to disclose the pendency of the SEC's investigation of the Company's EPS practices that were the product of insufficient controls over financial reporting.

**F.      Further False and Misleading Statements Related to a 2018 Credit Facility Agreement Sustained in the Securities Action**

204.    On December 31, 2018, the Company made material misstatements and omissions in the New Credit Facility Agreement described herein.  In the Agreement, which was dated December 21, 2018, and filed with the SEC on December 31, 2018 as an attachment to a Form 8-K signed by Defendant Shea, the Company represented that there were no investigations pending against it.  Specifically, Section 6.1.5 of the Credit Agreement states: "There are no actions, suits, proceedings, or investigations pending or, to the knowledge of any Loan party, threatened against such Loan party or any Subsidiary of such Loan Party at law or in equity before any Official Body

which individually or in the aggregate could reasonably be expected to result in any Material Adverse change."

205.   The Credit Agreement defined an "Official Body to include the United States government or a governmental agency, which would include the SEC.  Specifically, the Credit Agreement states: "<u>Official Body</u> shall mean the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government . . . and any group or body charged with setting financial or regulatory capital rules or standards (including the Financial Accounting Standards Board, the Bank of International Settlements of the Basel Committee on Banking Supervision or any successor or similar authority to any of the foregoing)."

206.   The statements and/or omissions in the Company's New Credit Facility Agreement filed as an attachment to a December 31, 2018 Form 8-K denying the existence of a material investigation of the Company were materially false and misleading because they omitted to disclose material facts about the SEC's investigation of the Company, including that: (i) in November 2017, the SEC commenced a matter under inquiry into the Company's EPS practices; (ii) the SEC's investigation into the Company's EPS practices escalated to a formal investigation and, in March 2018, the Company received a subpoena from the SEC; and (iii) during Q4 2018, the Company launched a costly internal investigation into the matters being investigated by the SEC, purportedly conducted by "a nationally renowned law firm and supported by a Big Four accounting firm's forensic practice."  Moreover, the Individual Defendants knew or were reckless in not knowing that the SEC's investigation into the Company's EPS practices was a material issue

for shareholders as of at least approximately March or April 2017 due to: (i) Monocle's outreach to Defendants McCartney, Wahl, and McKee prior to the March 23, 2017 publication of the Monocle Report; (ii) Defendant Wahl's April 12, 2017 response to an analyst question about the subject of the Monocle Report; and/or (iii) the Individual Defendants' concession that the ongoing investigation could have a "substantial" impact on the Company's expenses and financial results.

## VII.    THE TRUTH EMERGES

207.    On March 4, 2019, the Company announced that it received a letter from the SEC in November 2017 regarding an inquiry into the Company's EPS calculation practices, and then in March 2018, received a formal subpoena from the SEC in connection with the same practices. Also on that date, the Company announced that it was unable to file its Annual Report on Form 10-K for the year ended December 31, 2018, due to the pendency of an internal investigation into the practices that were the subject of the SEC's investigation.  The Company's stock price fell by more than 13% on this news.

208.    The Company's stock price has failed to recover after the March 4, 2019 announcement of the SEC investigation.  Having abandoned its long-standing misleading practice of strategic EPS rounding, the Company has continued missing analyst estimates in 2019.  Further, the Individual Defendants have admitted that the SEC's investigation has and could continue to adversely impact the Company's financial results and that its own internal investigation adversely impacted its results.

209.    On April 30, 2019, the Company issued a press release to announce its results for the three months ended March 31, 2019 ("Q1 2019").  For Q1 2019, the Company reported net income of $9.2 million or $0.12 per basic and per diluted common share, a miss of $0.24.  Reacting to these results, a Stephens securities analyst stated on April 30, 2019, "[t]he quarter will likely do

little to shake bears . . . consensus estimates will come down." In response to the April 30, 2019 news of the Company's Q1 2019 results, the price of the Company's stock fell from $33.85 to $31.96 on the next trading day, a decline of 5.58%.

210.    On May 1, 2019, the Company held an earnings call to discuss its Q1 2019 results. On behalf of the Company, Defendants Wahl and McKee participated on the call. Before the call began, the operator, speaking for the Company, stated, "[t]he ongoing SEC investigation and or any related litigation could adversely affect or cause variability in our financial results."

211.    On the same May 1, 2019 earnings call, Defendant McKee stated, "[n]ow SG&A [Selling, General & Administrative Expense] was also impacted by about $6 million of legal and professional fees related to the SEC matter, the majority of which related to the internal investigation that was completed in mid-March."

212.    During the same May 1, 2019 call, securities analyst, Sean Dodge, asked, "[y]ou said you can't really comment on the SEC matter, but I know you guys were working to be proactive and get a chance to present the findings of your internal review to them. Can you tell us if that's happened? Or is that still expected to happen?"

213.    In response, Wahl stated, "[y]eah, I think to your point we can't really get into much detail, other than to say, which we've talked about in the past. We are fully cooperating and obviously we're hopeful for a swift and successful outcome. And yes we did successfully complete the internal investigation in mid-March. But the conversations, the dialogue with the SEC is active and ongoing, and will continue to be, but it's one of those things when we're asked about a timetable or potential evolution of the matter, it's really – there's not a straight line, right there's stops and starts, and we're ready willing and able to continue to move as quickly or as slowly as the staff would like us to and again continuing to fully cooperate."

214.     On May 3, 2019, the Company filed its quarterly report for Q1 2019 on Form 10-Q with the SEC ("Q1 2019 Form 10-Q"). The Company stated that its expenses increased by more than $4 million for Q1 2091, stating, "[t]he increase was primarily a result of increased legal and other professional fees incurred during the first quarter of 2019 in connection with the Company's internal investigation related to the Securities Exchange Commission's inquiry regarding the Company's earnings per share calculation practices."

215.     On July 23, 2019, the Company issued a press release to announce its results for the three months ended June 30, 2019 ("Q2 2019"). For Q2 2019, the Company reported net income of $18.2 million or $0.24 basic and diluted earnings per common share. On July 23, 2019, a William Blair analyst noted that the Company's Q2 2019 results were "below Street expectations – once again largely . . . because of issues in the company's skilled nursing facility (SNF) client base." The William Blair analyst continued, "EPS were $0.24, which came in below the $0.35 consensus forecast and $0.35 in adjusted EPS in the prior-year period."

216.     On July 24, 2019, the Company hosted an earnings call to discuss its Q2 2019 results. On behalf of the Company, Defendants Wahl and McKee participated on the call. During the call, securities analyst, Ryan Daniels, stated, "[j]ust a couple of quick follow-ups at this point in regards to the $2 million in SG&A costs related to the SEC investigation, how should we think about that trended forward? Is that something that's just going to be a continuing cost until it's closed or because that accelerate decelerate? Just trying to get a better feel on the SG&A numbers for a model."

217.     In response Defendant Wahl stated, "Yes, Ryan. I would say going forward we do expect some level of elevated cost and will certainly call that out. As it's incurred each quarter over the back half of the year sitting here today just looking at the fact that there's no real updates

to share it's been fairly quiet.  We continue to remain cooperative but there's not any really know how noteworthy updates.  We would expect it to be somewhat less than what it was this past quarter where – there was some carryover from the internal review from Q1, difficult to project out.  There will be elevated cost back after the year we'd expect it to be less than what we incurred this quarter, btu again that's difficult to forecast depending on whether or not we need to utilize more man-hours from a professional or legal perspective."

218.    On July 26, 2019, the Company filed its quarterly report for Q2 2019 on Form 10-Q with the SEC (the "Q2 2019 Form 10-Q").  Defendants Wahl and Shea signed the Q2 2019 Form 10-Q.  The Q2 2019 Form 10-Q explained that, "consolidated selling, general, and administrative expense increased $3.9 million or 11.6%, to 8.0% of consolidated revenues, for three months ended June 30, 2019 compared to the corresponding period of 2018.  The increase was primarily a result of increased legal and other professional fees incurred in connection with the Company's internal investigation related to the Securities and Exchange Commission's inquiry regarding the Company's earnings per share calculation practices."

## VIII.  THE SEC'S INVESTIGATION AND THE SECURITIES ACTION REPRESENT SIGNIFICANT LOSSES FOR THE COMPANY

219.    The SEC's inquiry has not been resolved as of the date of the filing of this Complaint.  As disclosed in the Company's latest quarterly filing, its Q1 2021 Form 10-Q filed with the SEC on April 23, 2021 (the "Q1 2021 Form 10-Q"), the SEC's investigation remains an open investigation, with possible losses estimated to be up to $10 million:

> As previously disclosed, the Securities and Exchange Commission ("SEC") is conducting an investigation into the Company's earnings per share ("EPS") calculation practices, which focuses on periods prior to 2018. Following receipt of a letter from the SEC in November 2017 regarding its inquiry into those practices followed by a subpoena in March 2018, the Company authorized its outside counsel to conduct an internal investigation, under the direction of the Company's Audit Committee, into matters related to the SEC subpoena. This investigation was completed in March 2019 and the Company continues to cooperate with the SEC's

investigation and document requests. The Company and the SEC have been engaged in discussions regarding a potential resolution of the investigation. As a result of these discussions, the Company has determined, in accordance with ASC 450, that a liability is reasonably possible and currently estimates a range of possible loss of up to $10.0 million.

220.    In addition, the Q1 2021 Form 10-Q states the following with respect to the

Securities Action:

> On March 22, 2019, a putative shareholder class action lawsuit was filed against the Company and its Chief Executive Officer in the U.S. District Court for the Eastern District of Pennsylvania, seeking unspecified monetary damages and other relief on behalf of the plaintiff class. The initial complaint, which was filed by a plaintiff purportedly on behalf of all purchasers of the Company's securities between April 11, 2017 and March 4, 2019 (the "Class Period"), alleges violations of the federal securities laws in connection with the matters related to the Company's EPS calculation practices. On September 17, 2019, the complaint was amended to, among other things, extend the Class Period to cover the period between April 8, 2014 and March 4, 2019, and to name additional individuals affiliated with the Company as defendants.

> On March 17, 2021, the parties reached an agreement in principle to settle the action on a class-wide basis. The parties executed a term sheet outlining the pertinent terms of the proposed settlement, which is subject to confidentiality obligations at this time and remains subject to final documentation and approval by the court. Our insurance carriers have agreed to pay the entirety of the settlement amount upon court approval of the settlement. As of March 31, 2021, the associated contingency was included within the "Other accrued expenses" and "Prepaid expenses and other assets" captions on the Company's Consolidated Balance Sheet.

> The Company continues to vigorously defend against all active litigation claims asserted. Any of the foregoing matters could result in substantial costs to the Company, divert management's attention and resources, and adversely affect the Company's business condition or harm its reputation, regardless of their merit or outcome. In addition, the uncertainty of the pending lawsuit or potential filing of additional lawsuits could lead to more volatility and a reduction in the Company's stock price.

221.    The "other accrued expenses" and "prepaid expenses and other assets" which

include the contingencies the Company has reserved for the outcome of the Securities Action, were

reported to amount to $30,852,000 and $2,416,000, respectively, on the Company's Consolidated

Balance Sheet, as disclosed in HCSG's Q1 2012 Form 10-Q.  The Securities Action thus represents a significant cost to the Company and is part of a reserve accrual which exceeds $30 million.

## IX.     DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

222.    Plaintiffs bring this action derivatively in the right of and for the benefit of HCSG to redress injuries suffered, and to be suffered, by HCSG as a direct result of the breaches of fiduciary duty by the Individual Defendants.

223.    HCSG is named as a Nominal Defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiffs are, and at all times relevant hereto have been, continuous shareholders of HCSG.

224.    Plaintiffs will adequately and fairly represent the interests of HCSG and its shareholders in prosecuting and enforcing their rights.  Prosecution of this action, independent of the Board, is in the best interests of the Company.

225.    The wrongful acts complained of herein subject, and will continue to subject, HCSG to ongoing harm because the adverse consequences of the actions are still in effect and ongoing.

226.    On October 10, 2021, Plaintiffs sent a demand letter to the Board of HCSG (the "Demand Letter").  Through the Demand Letter, Plaintiffs demanded that the Board take the following actions:

a.     Appoint a special committee of independent directors (the "Special Committee") to investigate the matters set forth therein and institute legal action for damages against all responsible officers and directors if such legal action is in the best interests of the Company;

b. Empower, by Board resolution, the Special Committee to hire financial, legal, and other advisors as the Special Committee deems reasonably necessary to fulfill its investigatory role;

c. Empower, by Board resolution, the Special Committee to take such independent action as it deems appropriate under the circumstances, including prosecution of litigation or other disciplinary action, such as compensation penalties, against the Senior Executives and other culpable management for misleading the Board's independent directors concerning the accuracy of the Company's financial statements;

d. Reforming the Company's bonus claw back policy to permit claw back of executive discretionary bonus compensation when the executive is found to have made false statements concerning the Company's financial statements;

e. Amend and publicly disclose its policies related to, and form a new committee dedicated to policing, insider trading (respectively, the "Insider Trading Policy" and the "Insider Trading Committee"). Going forward, the Company shall prohibit all directors and executives, as well as their affiliates, from buying or selling HCSG securities and derivatives except pursuant to duly adopted 10b5-1 trading plans that have been publicly disclosed. The Insider Trading Committee, which is to fully consist of independent directors, will be authorized to waive this requirement and permit officers and other directors, as well as their affiliates, to make specific purchases or sales outside of such 10b5-1 trading plans. The details regarding any such waiver and transaction, including the reason(s) why the waiver was requested and why it was granted, must be publicly disclosed within ten days of the execution of the transaction. The members of the Insider Trading Committee and their affiliates shall not be permitted to receive any such waivers themselves. No less than once per year, the Insider Trading Committee shall be

required to conduct an assessment to determine if any HCSG director, officer, employee, or any of the foregoing's affiliates violated the Insider Trading Policy.  Any such violations will be publicly disclosed.  Moreover, the Insider Trading Committee shall be authorized to take action seeking disgorgement of any profit earned by an HCSG director, officer, employee, or any of the foregoing's affiliates in connection with a violation of the Insider Trading Policy.

       f.     The Insider Trading Committee shall be required to approve any release of an HCSG officer, director, employee, or any of the foregoing's affiliates from any lock-up agreement preventing them from selling HCSG securities or derivatives. The details regarding any such release, including the reason(s) why the release was requested and why it was granted, must be publicly disclosed within ten days of approval of the release. The members of the Insider Trading Committee and their affiliates shall not be permitted to receive any such releases themselves;

       g.     The Insider Trading Committee shall also be required to approve any proposed public offering or private placement of HCSG stock and any proposed repurchase of HCSG stock by the Company to ensure no such offering, placement, or repurchase violates insider trading and related federal securities laws. The Insider Trading Committee shall be required to disclose any violations of these policies and procedures. The Insider Trading Committee shall also be authorized to take action seeking disgorgement of any profit earned by an HCSG director, officer, employee, or any of the foregoing's affiliates in connection with a violation of these policies and procedures; and

       h.     Creating a sub-committee of the Board ("Board sub-committee") comprised of a majority of independent members, with appropriate advisors, or an independent council of advisors, charged with overseeing corporate governance reforms put into place in response to this

demand and (1) permit the Board sub-committee to meet in executive session without management; and (2) require the Board sub-committee to report periodically to the Board regarding the reforms.

227.    Plaintiffs also demanded the following further corrective corporate governance palliatives be taken given the interestedness of the Company's management and Board and apparent systemic lack of internal controls:

> We also demand that HCSG either: (i) replace two of its current directors with a new independent director; or (ii) add two additional new independent directors to the Board. In selecting a new independent director to serve on the Board, the Company shall proceed as follows:
>
> - Candidate Identification: As soon as reasonably practicable after Court approval of the settlement, the Board shall seek to identify potential candidates for the one or two new independent director position(s). Only candidates who would qualify as independent directors will be considered. The Board shall submit the names of the individuals to the Nominating and Corporate Governance Committee for review.
>
> - Selection Process: Following an initial background and suitability review, the Nominating and Corporate Governance Committee shall conduct a thorough review of each candidate (including commissioning detailed background checks and interviews of candidates and others who may have relevant information), and on the basis of that review, select from among them the candidates for recommendation to the Board. The Board shall submit its preferred candidate or candidates for election by stockholder vote at the next duly noticed annual meeting following Court approval of the settlement. The Board shall appoint candidates who have obtained majority approval or, in the absence of majority approval, direct the Nominating and Corporate Governance Committee to identify, review, and recommend additional candidates for a subsequent vote, until a new director has been elected.
>
> - Term of Selected Director: After his or her initial appointment to the Board, during his or her first term, the one or two additional independent director(s) shall be subject to dismissal only for mis-, mal-, or nonfeasance, based on a reasonable investigation and vote of a majority of the independent directors.
>
> In addition, presently, only two of the ten directors on the Healthcare Services Board are women. Diversity of thought and experience are crucial for constructive dialogue inside the boardroom. Gender diversity on the Board is especially important. There is compelling evidence that boards with a critical mass of women

outperform those that are less diverse. See Open Letter from F. Williams McNabb, III, Chairman and Chief Exec. Officer of The Vanguard Grp., Inc., to Directors of Public Companies (Aug. 31, 2017). Accordingly, we demand that Healthcare Services agree to interview at least one woman for every new Board position until the Company has at least six women on its Board.

228.    The Company's Board has not, to date, responded to the Demand.  To Plaintiffs' knowledge, the Board has neither appointed a Special Litigation Committee to investigate Plaintiffs' allegations, initiate litigation, nor commence any of the remedial activities demanded by Plaintiffs.  Pursuant to 15 PA Const. Stat. § 1781(a)(1), Plaintiffs may, therefore, maintain this action to enforce the rights of the Company.

## X.    CLAIMS FOR RELIEF

### COUNT 1
**(Derivatively Against the Individual Defendants for Breach of Fiduciary Duties)**

229.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

230.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of HCSG's business and affairs.

231.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

232.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of the Company.

233.    In breach of the fiduciary duties they owed to HCSG, the Individual Defendants willfully or recklessly made and/or caused the Company to make the false and misleading statements of material fact and material omissions alleged herein.

234.    The Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact alleged herein.

235.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of internal controls over financial reporting.

236.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and/or omitted material statements, and they failed to correct the Company's false and misleading statements and/or omissions of material facts. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and omissions were knowingly or recklessly made and were for the purpose and effect of perpetrating, facilitating, and perpetuating the manipulation of HCSG's EPS.

237.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them.  Such improper conduct was committed knowingly or recklessly and for the purpose and effect of manipulating HCSG's EPS.

238.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

239.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties, HCSG has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

<u>**COUNT II**</u>
**(Derivatively Against the Individual Defendants for Unjust Enrichment)**

240.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

241.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, HCSG.

242.    The Individual Defendants either benefitted financially from the improper conduct, including through insider sales, or received bonuses, stock options, or other similar compensation from HCSG that was tied to performance of EPS, other performance measures, and/or the artificially inflated valuation of HCSG, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

243.    Plaintiffs, as shareholders and representatives of HCSG, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

<u>**COUNT III**</u>
**(Derivatively Against the Individual Defendants for Abuse of Control)**

244.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

245.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence HCSG, for which they are legally responsible.

246.    As a direct and proximate results of the Individual Defendants' abuse of control, HCSG has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, HCSG has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT IV**
**(Derivatively Against the Individual Defendants for Waste of Corporate Assets)**

247.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

248.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused HCSG to waste valuable corporate assets, incurring many millions of dollars conducting the internal investigation, defending the ongoing SEC investigation, and defending the Securities Class Action.  Moreover, HCSG has suffered and continues to suffer significant reputational and economic damage.

249.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

**XI.    PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment and relief as follows:

a)    Declaring that Plaintiffs may maintain this action on behalf of HCSG, and that Plaintiffs are adequate representatives of the Company;

b)    Declaring that the Individual Defendants have breached their fiduciary duties to HCSG;

81

c)      Directing the Individual Defendants, jointly and severally, to account for all losses and/or damage sustained by HCSG by reason of the acts and omissions complained of herein, together with pre-judgment and post-judgment interest;

d)      Awarding HCSG restitution from the Individual Defendants, and each of them;

e)      Awarding Plaintiffs' attorneys' fees, expert fees, and other costs, expenses, and disbursements of this action; and

f)      Granting such other and further relief as the Court may deem just and proper.

## XII.   JURY DEMAND

250.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury.

Dated:  June 24, 2021

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*s/* Jonathan M. Zimmerman
Jonathan M. Zimmerman (Bar No. 322668)
Scott R. Jacobsen
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
E-mail: jzimmerman@scott-scott.com
        sjacobsen@scott-scott.com

Geoffrey M. Johnson
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone:  (216) 229-6088
Facsimile:   (860) 537-4432
E-mail: gjohnson@scott-scott.com

*Attorneys for Plaintiffs*

## VERIFCATION OF MARIA BATAN

I, Maria Batan, make the following verification in connection with the filing of the Verified Shareholder Derivative Complaint (the "Complaint") in the above-captioned action:

1.    I currently hold shares of Healthcare Services Group, Inc., and have held shares in Healthcare Services Group, Inc. since at least July 2007.

2.    I have reviewed the foregoing Verified Shareholder Derivative Complaint and know the contents thereof.  I certify that I have authorized the filing of said Complaint.

3.    I have selected Scott+Scott Attorneys at Law LLP and any firm with which it may affiliate for the purpose of prosecuting this action as my counsel.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is correct to the best of my knowledge.

Dated:  6/23/2021

Maria Batan

## VERIFCATION OF CLEMENTE BATAN

I, Clemente Batan, make the following verification in connection with the filing of the Verified Shareholder Derivative Complaint (the "Complaint") in the above-captioned action:

1.      I currently hold shares of Healthcare Services Group, Inc., and have held shares in Healthcare Services Group, Inc. since at least July 2007.

2.      I have reviewed the foregoing Verified Shareholder Derivative Complaint and know the contents thereof. I certify that I have authorized the filing of said Complaint.

3.      I have selected Scott+Scott Attorneys at Law LLP and any firm with which it may affiliate for the purpose of prosecuting this action as my counsel.

I declare under penalty of perjury under the laws of the United States of America that the foregoing information is correct to the best of my knowledge.

Dated: June 23, 2021

Clemente Batan
Clemente Batan